Argued June 10, affirmed December 22, 1965

ALDRIDGE ET UX *v.* SAXEY ET UX
409 P. 2d 184

*Gunther F. Krause,* Portland, argued the cause for appellants. With him on the brief were Fredric R. Merrill and Krause, Lindsay & Nahstoll.

*William F. Bernard,* Portland, argued the cause for respondents. On the brief were Bernard, Bernard & Hurley.

Before PERRY,* Presiding Justice, and GOODWIN, DENECKE, HOLMAN and LUSK, Justices.

## LUSK, J.

This is a suit to enjoin the defendants from keeping and maintaining on their property a large number of German Shepherd dogs in violation, as alleged, of restrictive covenants in a deed and as constituting a nuisance. The trial court entered a decree dismissing the suit and plaintiffs have appealed.

Plaintiffs, Mr. and Mrs. Abner F. Aldridge, were formerly owners of a tract of land comprising 70 acres in Clackamas County, Oregon, located on the outskirts of the metropolitan Portland area. They reside on the land. In 1961 they decided to sell some acre tracts for residential purposes. Sales were made to five different purchasers and deeds given containing restrictive covenants. Among the purchasers were Mr. and Mrs. Darin R. Laughery, who purchased a two-acre tract and in turn sold it to the defendants, Mr. and Mrs. Edward Saxey in August, 1963.

The restrictive covenants are as follows:

"(1) All building sites shall be used only for residential purposes and no dwelling shall be erected or placed on any building site having an area of less than 40,000 square feet.

"(2) No building shall be located on any residential building site less than twenty (20) feet from the front lot line, that is, the lot line adjoining a

---

* Did not participate in this decision.

street or road and no building shall be located less than ten (10) feet from any side or back lot line.

"(3) The habitable ground floor area of the main structure, exclusive of open porches, basements and garages, shall not be less than 1,000 square feet for a one-story dwelling nor less than 900 square feet on the main floor of any dwelling of a story and a half or two-story dwelling, which is the maximum height of any dwelling allowed to be constructed.

"(4) No structure of a temporary character consisting of a trailer, shack, shed or other temporary building shall be used for a period exceeding one year.

"(5) Livestock allowed on the premises, except for dogs and cats, is limited to horses, cattle, sheep, chickens and rabbits, all to be used only for the use of the family residing in the dwelling on the premises and are not to be maintained in unreasonable numbers or for any commercial purpose. In the event such animals are kept, the barn or other structure that the animals are kept in must be maintained in a neat and orderly manner."

It was further provided that the covenants should run with the land.

The defendants were aware of the restrictions before they purchased the property.

The defendants moved to Oregon from Sunnyside, Washington, where, in addition to Mr. Saxey's employment as a laboratory technician, they were engaged in the business of training, breeding and boarding dogs for profit. In Washington they maintained more than 40 dogs on 17 acres of land. Upon purchasing the Oregon property they commenced construction of a dog kennel 8 by 40 feet in size and comprising 11 compartments. While this work was in progress it came to the attention of the plaintiffs, who wrote a

letter to defendants' vendors, the Laugherys, warning them against a possible violation of the restriction limiting the use of the premises to residential purposes. The kennel was, nevertheless, completed and defendants brought to the premises 16 German Shepherds and 5 small dogs, 4 Papillons and 1 Schipperke. At the time of the trial the defendants had on the premises 14 German Shepherds in addition to the small dogs. After the initial letter from the plaintiffs, above referred to, correspondence between attorneys for the respective parties ensued in which, in addition to the claimed violation of certain of the restrictions, the attorney for the plaintiffs charged that the barking of the dogs constituted a nuisance. This suit was filed on March 19, 1964, based on both grounds. The complaint charges that keeping the dogs on the defendants' property violates the covenant restricting the use of the property to residential purposes and the covenant regarding livestock. It further alleges that the barking of the dogs at all hours of the day and night, offensive smells incident to the dogs' presence and pollution of a small stream running through the defendants' property and used by them in washing the kennel constitute a nuisance.

 We put out of view at once the claimed violation of the restriction upon the keeping of livestock. It may be, as plaintiffs argue, open to the interpretation that the restriction includes dogs and cats in addition to horses, cattle, sheep, chickens and rabbits, but the rule is that, because of the public policy favoring untrammelled land use, such restrictions are construed most strongly against the covenant and will not be enlarged by construction: *Rodgers et ux v. Reimann et ux*, 227 Or 62, 66, 361 P2d 101; *Schmitt et ux v. Cul-*

*hane et al,* 223 Or 130, 132, 354 P2d 75; 5 Powell on Real Property 153, § 673. The apparent meaning of the covenant is that dogs and cats are excepted from it and the grammatical construction, at least, is that the word "all," in the clause commencing "all to be used," refers to the animals enumerated in the clause immediately preceding it and not to dogs and cats. The grantors were evidently thinking about farm animals, not household pets when they prepared the restriction.

■ We may also put to one side the charge that the dogs are kept for commercial purposes. The clear preponderance of the evidence is to the contrary. The defendants keep the dogs as a hobby. They exhibit the German Shepherds in dog shows and have won a number of trophies and one cash prize of $25; but, so far as this record discloses, they abandoned the kennel business when they moved to Oregon. It should be added that Mr. Saxey has since then been employed as a laboratory technician in Portland.

Neither is there any substantial evidence of offensive smells or pollution of the stream.

It remains to consider the charge that keeping the dogs is a violation of the covenant that the property shall be used only for residential purposes (apart from the unfounded claim of commercial use) and that the noise of the dogs barking constitutes a nuisance.

■ On the question of nuisance the courts consider the location and character of the neighborhood, the extent and frequency of the injury and the effect upon the enjoyment of life, health and property. In a purely residential area very strict rules are enforced and only slight interference with residential rights is tolerated. The interference wtih the use and enjoyment

of land is not actionable unless it is substantial and unreasonable. Whether the annoyance or inconvenience is sufficient to constitute a nuisance depends upon its effect upon a person of ordinary habits and sensibilities. The foregoing is a summarization of the factors to be considered, as more fully developed in *York et ux v. Stallings et al,* 217 Or 13, 20-21, 341 P2d 529. With reference to noise, the time when it occurs may be relevant. Noises which occur during the hours usually devoted to sleep may constitute a nuisance even though this might not be so at other times: 66 CJS 775, Nuisance § 23.

The area in which the property involved is situated is known as Happy Valley. It was classified by the judge, who viewed the premises, as "semi-rural" and this is probably as fitting a characterization of it as any other that might be chosen. It is not a highly developed suburban district. In the immediate vicinity of the restricted area are large tracts, one, for example, of 45 acres on which the owner keeps 7 beef cattle, some calves and 14 geese. Everyone, apparently, has one or more dogs. There are deer in the area. Photographs in evidence disclose woods, fields, pastures and orchards. On the property retained by the plaintiffs they grow annually a crop of hay which they sell. The dwellings are a considerable distance apart. The plaintiffs' home is between 275 and 300 feet from that of the defendants. Other witnesses testified that the distances from their homes to that of the defendants were, respectively, 600 feet, between 600 and 700 feet, and between 800 and 1600 feet. While there is no covenant in the deed prescribing the minimum cost of dwellings to be built, their minimum size and height are prescribed. The provision allowing horses,

cattle, sheep, chickens and rabbits, though only in reasonable numbers—whatever that may mean—is itself somewhat indicative of the character of the locality. It is not a farming community, however, and the property owners who testified have their occupation or business in Portland or Oregon City.

The dogs are not permitted to run at large, but are fenced in, and are exercised each day by Mrs. Saxey. It is admitted by defendants that the exercise period takes one hour and a half and that the dogs are noisy during this period. At first the exercise period was during the morning. Mrs. Saxey testified: "[W]hen we first start to exercise the youngsters want to play, so they are quite noisy and the ten older ones will bark at them." (Six of the Shepherds are old, as dogs' ages go, and four are young.) A neighbor living 600 feet away who worked at night and whose sleeping time was from four in the morning until noon, could not sleep because of the barking. Upon his complaining to the defendants they changed the exercise period to the afternoon. The defendants' testimony is to the effect that when they are at home the dogs will usually stop barking at their command, but this is not always so and occasionally, as Mr. Saxey testified, they shoot from an air gun against the side of the kennel and this quiets them. A neighbor testified that this practice did not commence until after the filing of this suit.

Mr. Aldridge, a sufferer from emphysema, is no longer able to work and is at home during the day. He testified that the dogs barked two or three times a day (meaning during the daylight hours); that the barking in the daytime lasts as long as 15 or 20 minutes; that he is up nearly all night because of his breathing difficulty and he hears the barking quite

frequently at night, though not for so long a time. He said: "Apparently they all bark at the same time." "If there was somebody there, they generally don't bark for as long a period of time as they do if there is nobody there." He has had to quit smoking and this has made him nervous and when he has been outside the barking has disturbed him so that he has to come into the house to get away from it. He conceded that the barking had never awakened him at night, but added that he was awakened by so many other things, usually by his difficulty with breathing, that he could not say that the dogs ever woke him at night.

Mrs. Aldridge is employed in Portland and is, therefore, away from home during the day except on weekends. She testified that the dogs have never awakened her at night, but she has been disturbed by them perhaps a half a dozen times at night when she was awake and has gotten up and shut the windows. She could not state definitely how many times she had heard the dogs barking in the daytime. The dogs were quiet when she regularly drove down by the Saxeys' home in the morning and when she came home at night.

Besides the parties, six witnesses testified for the plaintiffs on the subject of barking and four on behalf of the defendants. A neighbor who lives 600 feet from the Saxey property testified that the barking was "awfully noisy" at times, especially when there is no one at home at the Saxey place; that it sounded as though 15 or 20 dogs were barking at the same time and there were times when the dogs barked continuously for more than four hours. She further testified that she slept soundly and the dogs did not bother her at night.

Another neighbor who lives about 600 feet from the

dog kennel testified that about two-thirds of the time the dogs bark all day long and this is when Mrs. Saxey is away, which she said was sometimes for as long as six hours. She also swore that she had been awakened by the dogs a few times at night.

As contrasted with this testimony a neighbor called by the defendants testified that she had never heard the dogs bark when they were being exercised and paid no more attention to their barking than to the noise of geese and horses. There is a fire siren in the area which is sounded every Tuesday evening for a practice drill as well as when there is a fire and there is ample testimony that the dogs do bark or howl when the fire siren is sounded. The witness just mentioned testified that she had never heard the dogs when the fire siren was going and, indeed, that she had never heard the fire siren.

Little weight can be given to the testimony of witnesses on either side who took extreme positions. The testimony of the plaintiffs themselves appears to be fair and, as nearly as can be determined from the cold record, to portray the situation as it actually exists. It is highly material that neither of them testified that their rest at night had been disturbed by the barking of the dogs; that only one witness testified to being awakened at night and this occurred only a few times and the witness had not complained to the defendants about it; and that the only evidence of serious interference with the sleep of any of the neighbors was that about the man who worked at night and whose daytime sleep was disturbed. This cause of complaint was removed when the defendants changed the exercise time of the dogs. Except for the complaint just mentioned and that of the plaintiffs, there is no evi-

248

dence that anyone complained to the defendants about the noise of the dogs barking. Mr. Aldridge's personal comfort, it must be conceded, was interfered with, but due to the state of his health and his nervous condition, it cannot be said that he is a person of normal sensibilities. See 4 Restatement, Torts § 827, comment d.

A few cases have come to the appellate courts in which the keeping of barking dogs has been abated as a nuisance. See *Krebs v. Hermann,* 90 Colo 61, 6 P2d 907, 79 ALR 1054, and cases cited in Annotation 79 ALR 1060 at 1067. It is significant that in all these cases save one it was shown that the sleep of those living nearby was disturbed. In the case where this did not appear, *Hechelman v. Kindt,* 22 Pa Dist R 791, 40 Pa Co Ct 277, the dog was shut up in a room for an hour each day on premises 25 feet away from the residence and office of the plaintiff, a physician. During this period the barking and yelping of the dog interfered with the plaintiff in making physical examinations of his patients.

It is everywhere held that equity jurisdiction to enjoin an alleged nuisance is exercised sparingly and cautiously: 66 CJS 870, Nuisances § 111a, and only where a clear and strong case is shown: Id. 876, § 111e. This is a doubtful case and one in which due weight should be accorded to the decision of the circuit judge who not only had the advantage of seeing the witnesses and hearing them testify, but, through his view of the premises, was able to gain a better knowledge and understanding than ours of the nature of the locality involved.

As we have previously held, the evidence does not support the charge that the maintenance of the dogs by the defendants is a commercial enterprise. We

further hold that, considering all the circumstances, their maintenance does not otherwise constitute a violation of the covenant against use of the premises for non-residential purposes.

We conclude that the plaintiffs have not sustained the burden of proof and the decree is affirmed. No costs or disbursements will be allowed.