329 A.2d 807.

ANTHONY DeNUCCI et al. vs. JOSEPH R. PEZZA et al.

DECEMBER 19, 1974.

PRESENT: Roberts, C. J., Paolino, Kelleher and Doris, JJ.

KELLEHER, J. If today's municipal planner were to visit the town of Johnston and inspect the area adjacent to the intersection of Armento and Diaz Streets, he would

shake his head and wonder what went wrong. His view would disclose a series of "well-kept and well-maintained" dwellings interspersed among such industrial establishments as a slaughterhouse, a gravel bank, a cement-mixing plant, a chemical plant, an automobile junkyard and a motor freight terminal. The plaintiffs each own or reside in one of the well-kept homes. Joseph R. Pezza is the sole stockholder of a corporate interstate motor carrier that operates out of a freight terminal owned by him and his wife. The Pezzas and Pezza Transportation, Inc. are before us on an appeal from a judgment entered after a Superior Court justice enjoined certain activities associated with the terminal's operations. Hereinafter, we will whenever appropriate refer to the defendant husband as "Pezza" and the carrier as "Pezza Transportation."

Armento Street runs in a general easterly direction beginning at George Waterman Road and ending at a point near the western bank of the Woonasquatucket River. Diaz Street, as it runs in a north-south direction, meets and intersects Armento Street. Anthony DeNucci and his sister live on the easterly side of Diaz Street in the DeNucci family homestead. Their parents, both deceased, purchased this real estate in July 1923. Their deed contained restrictive covenants calling for a mandatory building setback of 10 feet from the street line and a minimum $1,000 value for any dwelling built on the premises. Michael Accetturo and Fred Zinni are Anthony's brothers-in-law. Michael, his wife and their children are Anthony's next-door neighbors. Fred and his family live on Orlando Street—one block to the west of Diaz Street. Michael's house was erected in 1960, Fred purchased his property in 1950.

The freight terminal is located on the southerly side of Armento Street just below the Armento-Diaz intersection. It is described in the record as a modern one-story L-

shaped brick building with a loading dock designed for tail-gate loading.

Pezza's first contact with the motorized transportation industry occurred in 1959 when he started hauling livestock. Later, he won a government contract involving the delivery of mail. In 1961 he purchased the interstate commerce rights of a general commodities carrier, and business began to improve. Sometime in 1969 Pezza Transportation[1] began to enter into a series of so-called interchange agreements with other interstate carriers, all of whom are headquartered at points outside of Rhode Island. Under this arrangement, an out-of-state carrier's tractor-trailer rig would come to Armento Street, the trailer would be disconnected, and the shipment would be transferred to Pezza Transportation trucks. The trucks would then make deliveries throughout Rhode Island and numerous locations in Massachusetts. After delivery, cargo destined for the original carrier would be loaded onto the trucks and return to the Johnston terminal. There, the cargo would be transferred to a trailer that would be departing for an out-of-state destination.

The interstate agreements caused a substantial increase in the Armento Street traffic and presented Pezza with a space problem. Consequently, in June 1970, Pezza and his wife purchased a parcel of unimproved land that fronted on the northerly side of Armento Street and bounded southerly on the DeNucci property. The parcel which was directly across the street from the terminal had been cleared and graded. It served as a combination switching yard and parking lot. The out-of-state rigs would come into Johnston at all hours of the night and day. Sometimes the tractor's crew would "unhook" the tractor, "hook" the tractor to a waiting trailer, and im-

---

[1]Pezza Transportation began its corporate identity in 1965.

mediately leave. Often the rigs would roll in during the late night or early morning at a time when the terminal was closed. Many of these rigs were owned by a carrier that transported freight from the states of Florida, Georgia, and South Carolina to the New England area and returned to their original point of departure with cargo destined for delivery in that part of the country.

The creation of the parking lot precipitated this litigation. The trial justice listened to testimony indicating that the nighttime arrival of the trailer trucks caused noise of such a volume that it would wake up plaintiffs and members of their families. The plaintiffs' witnesses spoke of the roar of the tractors' diesel engines as well as the noise emanating from the motors of the refrigerated trailers that were parked in the lot awaiting the arrival of a tractor. There was evidence of an increase in the decibel count as the driver tried to attach his tractor to a trailer. Some of the witnesses told of tractors being allowed to remain in the lot with their motors running for long periods of time.

While denying that any of plaintiffs' complaints could be directed at his corporate employees, Pezza conceded that he had no control over the actions of the out-of-state carriers whose crews and vehicles arrived at the Armento Street lot at any time around 10 p.m. It was agreed that a careless driver in backing his tractor up and under an unattached trailer could give the locking mechanism a real "wallop." There was evidence that at times the crew would sleep in the trailer's cab as they waited in the parking area for 7 a.m. and the beginning of another day's business across the street at the terminal. One witness described how the trucks were designed so that on a long haul one man could sleep while the other drove. There was also testimony indicating that on cold nights the tractor's crew would run the engine to warm up the in-

terior of the cab. A neighbor told the trial justice that she was awakened by the "hooking" and the "unhooking" and complained to the police.

It was stipulated by the litigants that the land lying to the north of Armento Street (including plaintiffs') was classified as industrial when Johnston adopted a zoning ordinance in 1952. The property on Armento Street's southerly side was zoned general residential. The freight terminal enjoys status as a legal nonconforming use.

There is no question that the trial justice was favorably impressed by plaintiffs' complaints about the parking lot noises and a consequent loss of sleep. As we begin our consideration of the issues presented in this case, we will turn to the classics and recall what has been said about the precious commodity called sleep.

We need only to refer to the fabled *Don Quixote,* where Cervantes wrote:

> "Blessing on him who invented sleep,—the mantle that covers all human thoughts, the food that appeases hunger, the drink that quenches thirst, the fire that warms cold, the cold that moderates heat, and, lastly, the general coin that purchases all things, the balance and weight that equals the shepherd with the king, and the simple with the wise." (Jarvis's translation)

The defendants who, we are sure, find no fault with the thoughts expressed by such a distinguished mind as Cervantes do indeed fault the trial justice because of his failure to acknowledge the presence of the industrial zone in which plaintiffs and the switching-yard parking lot find themselves.

It is a well-recognized principle that compliance with a zoning ordinance does not immunize a person from the consequences of his making an unreasonable use of his land whereby he invades the private rights of his neighbor.

*Commerce Oil Ref. Corp.* v. *Miner,* 281 F.2d 465 (1st Cir. 1960); *Hobbs* v. *Smith,* 177 Colo. 299, 493 P.2d 1352 (1972); *Weltshe* v. *Graf,* 323 Mass. 498, 82 N.E.2d 795 (1948); *Kozesnik* v. *Township of Montgomery,* 24 N. J. 154, 131 A.2d 1 (1957); *Sweet* v. *Campbell,* 282 N. Y. 146, 25 N.E.2d 963 (1940); *Dunham* v. *Zoning Board of Review,* 68 R. I. 88, 97, 26 A.2d 614, 618 (1942). The fact that the disputed activities are permitted by law may have some relevancy on the issue of whether or not the use being made of the premises is reasonable, but where a private nuisance has been caused, judicial relief can be had even though the business or activity complies with the zoning ordinance. To hold otherwise would be tantamount to allowing a regulatory agency to license a nuisance.

No one need suffer a neighbor's unreasonable use of his property. Long ago, this court in acknowledging the validity of the complaints of homeowners about loud thumping noises emanating from the operation of a drop hammer said:

> "The rule of law is well settled that every person is bound to use his property so as not to injure that of another, or interfere with the reasonable and proper enjoyment thereof and that the carrying on of a business which creates noisome smells, or noxious vapors, or causes great and disturbing noises, jarring or vibrations, which affect injuriously property in the vicinity or render the occupation thereof inconvenient and uncomfortable, is a nuisance for which a person whose property is damaged or whose health is injured or whose reasonable enjoyment of his estate as a place of residence is impaired or destroyed thereby, may maintain an action to recover compensation for the injury, and that in such case a court of equity will restrain the continuance of the nuisance by injunction." *Blomen* v. *N. Barstow Co.,* 35 R. I. 198, 211, 85 A. 924, 928 (1913).

Apart from these apt observations, we would repeat this judicious comment uttered over a half century ago:

> "Mankind needs sleep for a succession of several hours once in every twenty-four hours, and nature has provided a time for that purpose, to wit, the nighttime, and by common consent of civilized man the night is devoted to rest and sleep, and noises which would not be adjudged nuisances, under the circumstances, if made in the daytime, will be declared to be nuisances if made at night and during the hours which are usually devoted by the inhabitants of that neighborhood to sleep." *Gilbough* v. *West Side Amusement Co.,* 64 N. J. Eq. 27, 28-29, 53 A. 289, 289 (1902).

Noise in and of itself can be a nuisance if it unreasonably interferes with a person's use and enjoyment of his property. The time when the noise is being made should be taken into account. *Aldridge* v. *Saxey,* 242 Ore. 238, 409 P.2d 184 (1965). To amount to a nuisance the noise must be unreasonable, and reasonableness in this respect is a question of fact. *Muehlman* v. *Keilman,* 257 Ind. 100, 272 N.E.2d 591 (1971).

We think it clear that the late evening and early morning switching of vehicles was an unreasonable use of the Pezzas' property. We make this statement fully cognizant of the principle that the criterion in determining whether a particular annoyance is sufficient to be classified as a nuisance is its effect upon a person of ordinary habits and sensibilities. *Belmar Drive-In Theatre Co.* v. *Illinois State Toll Highway Comm'n,* 34 Ill.2d 544, 216 N.E.2d 788 (1966); *Smith* v. *Western Wayne County Conservation Comm'rs,* 380 Mich. 526, 158 N.W.2d 463 (1968); *Aldridge* v. *Saxey, supra*; Prosser, *Torts* §87 at 578 (4th ed. 1971). The defendants claim that the present suit must fail because plaintiffs are individuals who have supersensitivities. The sole basis for this allegation is the condition of Anthony's sister, Josephine. She testified that the noise

coming from the lot woke her up. At trial time she was under the long-term care of a physician. She told the trial justice, "I can accept sickness but I cannot accept those trailers. When they hitch, they make me roar."

We shall, arguendo, assume that Josephine's ailments are such that she is supersensitive to the noises heard in the Armento Street area. However, she is not a plaintiff. There is nothing physically or emotionally wrong with the three plaintiffs or their neighbor, all of whom were awakened by the hitching and the unhitching of tractors and trailers in Pezzas' parking lot-switching yard.

The injunction fashioned by the trial justice is a model of a proper balancing of the equities. In their complaint, plaintiffs sought an immediate cessation of all truck or tractor traffic on Armento Street that might be destined for the Pezzas' properties. The trial justice, however, recognized that the Pezzas' lawful business efforts were to be restricted only to the extent necessary for the reasonable protection of plaintiffs' rights and he found that they had no basis for any complaints about noise occurring during the terminal's normal business hours, to wit, "7:00 A.M. to 11:00 P.M." On the other hand, the trial court was well aware that noise at 3 a.m. can be more disturbing than noise heard at 3 p.m., and he acted accordingly. The only activity that he restricted was any trailer hitching or unhitching in the parking lot during the 8-hour interval beginning at 11 p.m. and ending at 7 a.m. The issuance of an injunction and the scope and quantum of injunctive relief rest in the sound discretion of the trier of fact. *Nair v. Thaw*, 156 Conn. 445, 242 A.2d 757 (1968); *cf.* Spater, *Noise and the Law*, 63 Mich. L. Rev. 1373, 1380 (1965).

The trial justice has, by the relief he has fashioned, recognized the character of the area and plaintiffs' need for some period of undisturbed rest. He thought little of

plaintiffs' objection to the engines' noise. However, he has eliminated just one injurious feature of a use permitted by law without requiring a complete shutdown of the interstate commerce efforts of Pezza Transportation.

We see nothing in this record that justifies any nullification or modification of this mandate. Even though something might have gone awry with the town of Johnston's comprehensive plan, the plaintiffs have established their right to have, at their daily disposal, an 8-hour period during which they may place their heads on a pillow, hopefully go to sleep, dream perhaps the impossible dream, and then awake renewed and refreshed, ready to go to work or to spend another 16 hours of watching and hearing the transportation industry as it switches from one vehicle to another.[2]

The defendants' appeal is denied and dismissed.

Mr. Justice Joslin did not participate.

*Gilbert V. Indeglia*, for plaintiffs.

*Adler, Pollock & Sheehan, Incorporated, Edward L. Maggiacomo*, for defendants.

---

[2]The moratorium on switching envisioned by the trial justice's decision has not yet been enjoyed by the plaintiffs, as the trial court stayed the effect of his injunction pending our determination of the defendants' appeal.