GIMMICKS, INC., d.b.a. The Red Brick Tavern, a.k.a. Church House Inn, a.k.a. Red Brick Canyon

v.

Raymond DETTORE, Jr., et al.

No. 91–385–M.P.

Supreme Court of Rhode Island.

July 1, 1992.

Daniel E. Chaika, Cranston, for petitioner.

Kevin F. McHugh, Special Counsel, City of Providence, for respondent.

## OPINION

SHEA, Justice.

This matter comes before the Supreme Court on the plaintiff's petition for certiorari to review the decision of the Providence Board of Licenses that denied the plaintiff's application for an out-door-entertainment license. We affirm.

On June 17 and 26 and July 15 of 1991, Raymond Dettore, Jr., Thomas J. Boyle, Arlene Feldman, and Paul McCormick, as members of the City of Providence Board of Licenses (board), conducted a hearing on the application of plaintiff, Gimmicks, Inc. (Gimmicks), for an outdoor-entertainment license. Following the hearing the board voted on July 15, 1991, to deny Gimmicks's application. Gimmicks filed with this court a motion to stay the board's decision and a petition for issuance of a writ of certiorari on July 22, 1991. Gimmicks's petition for writ of certiorari was granted, and its motion to stay was denied by an order of this court dated July 24, 1991.

Gimmicks operates the Church House Inn (tavern) at 122 Fountain Street in Providence, Rhode Island. It holds a class–15 tavern license, class-Bx license, a food license, a Sunday-sales license, a first-class tavern license, and an entertainment license (on a monthly basis). The board grants expansion-of-premises licenses on a yearly basis, provided the proper applications have been filed and there are no objections. An expansion-of-premises li-

cense permits the holder to expand its liquor-license and food license to business outside the premises during the period May 1 through October 31. Provided there are no objections, the holder's entertainment license may also be expanded to use outside the premises.

On May 1, 1991, the board voted to grant Gimmicks's application for an expansion-of-premises license in regard to the liquor and food licenses but denied the application in regard to the entertainment license. Gimmicks filed an action pursuant to G.L.1956 (1988 Reenactment) § 42–35–15 in the Superior Court. As a result of Gimmicks's motion, the trial justice granted a temporary restraining order directing the board not to interfere with Gimmicks's presentation of outdoor entertainment pending a hearing before the board.

On June 17 and 26 and July 15, 1991, the board conducted a hearing on Gimmicks's application to expand its entertainment license to use outside the premises. The evidence presented at the hearings reveals that the resident manager of the Providence Biltmore Hotel (Biltmore) filed an objection to Gimmicks's application for outside entertainment. The Biltmore is located a few blocks east of the tavern. The resident manager testified that every night that outdoor music was offered by the tavern in 1990 and 1991, guests staying at the Biltmore complained that the noise prevented them from getting sound, restful sleep. The resident manager did not keep a record of the complaints. He testified that the Providence police were contacted twice in 1991 and asked to take sound-level readings to see if there was a violation, but he was informed that the police were unable to take readings because of technical problems. The resident manager also informed the board that the noise generated by the outdoor bands is excessive in spite of efforts by the tavern to reduce the noise level in 1991. Finally, the resident manager testified that he resides at the Biltmore and finds the noise unacceptable.

The managing director of the Biltmore also appeared at the hearing. He informed the board that the Biltmore objected to Gimmicks's outdoor-entertainment application.

Lieutenant Paul Fitzgerald (Lt. Fitzgerald) of the Providence police department testified that in the fall of 1990 he responded to a complaint made by the Biltmore about noise coming from the tavern. When Lt. Fitzgerald arrived at the Biltmore, he spoke with one Mr. Glick, a manager. Glick explained to Lt. Fitzgerald that although the Biltmore had complained about the noise level numerous times over the summer, the problem had not been corrected. The board sustained Gimmicks's objection to the admission of noise-meter readings taken by Lt. Fitzgerald at varying distances from the tavern. However, Lt. Fitzgerald was permitted to testify about his personal observations. He stated that while standing outside the Biltmore, he could understand every word being said over the tavern speaker system.

Sergeant Robert MacDonald (Sergeant MacDonald) of the Providence police department testified that on May 26, 1991, he responded to a complaint about the noise coming from outdoor entertainment at the tavern. He informed the tavern's proprietor, Beverly A. Klegraefe (Klegraefe), of the complaint. At about 1 a.m., while a band was playing, Sergeant MacDonald and Victor Brown, the proprietor's son, entered a room on the fourteenth floor of the Biltmore on the side that faces the tavern. Sergeant MacDonald testified that he could hear the muffled sound of music through the closed window. With the window open, the music could be clearly heard. Sergeant MacDonald noted that when a car with a defective muffler went by, it was definitely louder than the music. At the same time he commented that if he were paying money to stay at the Biltmore, he would have a serious problem with noise because he would find the music very annoying.

Klegraefe, the proprietor of the tavern, testified that she was aware that certain neighbors were complaining about the noise emanating from the outdoor entertainment. She claimed to have gone over to the Biltmore three or four times in 1990 to determine how loud the noise was in the

hotel rooms. On one occasion she was accompanied by the Biltmore manager. Klegraefe testified that she could hear the music only when the room window was open and that the music was not as loud as the cars driving by.

Klegraefe admitted that residents of the Regency apartment complex (Regency) also complained about the sound in 1990. The Regency is a few blocks west of the tavern. Klegraefe testified that during a June 16, 1991 telephone conversation with the Regency manager, Klegraefe urged her to call if the music volume was too loud. Klegraefe again wants to offer outdoor entertainment on Thursday, Friday, and Saturday nights through the summer. She is willing to reposition the speakers and lower the volume to solve the noise problem.

Michael Grattage (Grattage), an audio engineer for Sounds Stage Audio, testified about the outdoor sound systems he set up for the tavern in 1990 and 1991. He was instructed to set up a smaller, more controlled sound system in 1991 to reduce the distance that the sound would travel. Additionally the speakers were repositioned to lower the sound volume. He testified that on one night in May when the smaller, repositioned system was operating, he could not hear the sound through a closed window in the men's room on the seventeenth floor of the Biltmore. However, on cross-examination Grattage admitted that at the time his hearing was impaired because he had been operating a sound board for a speaker system generating 100 to 105 decibels of sound. He also admitted that there were other people talking while he was in the men's room.

The assistant front-office manager (assistant manager) of the Biltmore was originally called by Gimmicks to testify that on the weekend of the ninth of June she did not hear any music coming from the tavern or receive any complaints from guests of the hotel. She explained to the board that after giving a statement to Gimmicks on June 15, she realized that the band had played inside the tavern. Over Gimmicks's objection the assistant manager was permitted to testify about her personal recol-

lection of complaints by hotel guests in 1990 and 1991. She recalled receiving many complaints about the noise level in 1990. In 1991, while she was taking their reservations, members of the Watchtower group expressed concern about returning to the Biltmore because of the noise problems they experienced the year before, when they were unable to sleep because of the loud music.

A letter written by the vice president of administration of the Providence Journal was read into the record. In the letter he objected to the granting of an outdoor-entertainment license. The vice president explained that in July of 1990, while he and his family were staying at the Biltmore, they found the noise generated by the outdoor bands excessive. He also mentioned in the letter that the overnight sports desk staff at the Providence Journal were complaining that the music was quite loud.

Victor Brown (Brown), Klegraefe's son, testified that he is in charge of hiring the bands and the persons who set up the sound system. He admitted that neighbors complained about the volume in 1990. Brown claimed that those complaints were brought to his attention at the end of the outdoor season so that he was unable to take steps to rectify the problem until the next year. In 1991 he tried to solve the problem by setting up a smaller sound system, repositioning the speakers, and taking total control over the sound level of the outdoor entertainment.

On May 25 or 26 and on June 21 of 1991 a Providence police officer and Brown took sound readings from rooms in the Biltmore that faced the tavern. The first time a sound meter owned by Brown was used; the second time the Providence police officer also brought a sound meter. The readings from the sound meters were not discussed during Brown's testimony. Brown also testified that although he attempted to take sound readings outside the Journal Bulletin building on the twenty-fifth of May, he found that the music was not loud enough to register on his meter.

At the close of evidence the board unanimously voted to deny Gimmicks's applica-

tion for an outdoor-entertainment license. The board found that the noise level generated by the outdoor entertainment both disturbed the sleep of people staying at the Biltmore and disturbed the work conditions of the Providence Journal. The board also concluded that the objectors had sustained their burden to show why the board should deny the application for outdoor entertainment. Gimmicks did not present sufficient evidence to rebut the objectors' evidence that the outdoor entertainment disturbed the peace and tranquility of the neighboring establishments. The board found most telling the comment of Sergeant MacDonald, who testified that he would not want to stay in a room at the Biltmore that faced the tavern because the loud music would be disturbing. The board explained that the type of music was not at issue; rather it was the loudness of the music upon which its decision was based. Competition was also not an issue because the tavern room rate of $33 per night and the Biltmore's room rate were significantly disparate. Additionally the board noted that although there are several places in the city of Providence that offer outdoor entertainment, objections to applications for 1991 outdoor-entertainment licenses were filed against only Gimmicks's tavern and one other club.

## I

The first issue before us is whether the board's decision was supported by the evidence in the record. Gimmicks argues that the board's decision is contradicted by the evidence presented at the hearing.

We note at the outset that our review is quite limited in these matters.

"The granting or denial of a license is a function that is administrative in its nature and is discretionary with licensing boards or officers. This court has no control over the lawful exercise of that power. * * * We will, however, intervene by certiorari for the purpose of determining whether such boards or officers have exceeded their jurisdiction. In reviewing the action of a licensing authority on the question of whether it has

exceeded its jurisdiction, we will examine the evidence, not to weigh it or pass upon its credibility but only to ascertain whether there is any legal evidence to support the ruling." *Fink v. Bureau of Licenses*, 90 R.I. 408, 414, 158 A.2d 820, 823 (1960).

Here, the board members voted to deny Gimmicks application for an outdoor-entertainment license because they found that the noise level generated by the outdoor entertainment constituted a nuisance to those in the neighboring area attempting to sleep.

This court has had occasion to say:

"Mankind needs sleep for a succession of several hours once in every twenty-four hours, and nature has provided a time for that purpose, to wit, the nighttime, and by common consent of civilized man the night is devoted to rest and sleep, and noises which would not be adjudged nuisances, under the circumstances, if made in the daytime, will be declared to be nuisances if made at night and during the hours which are usually devoted by the inhabitants of that neighborhood to sleep." *DeNucci v. Pezza*, 114 R.I. 123, 129, 329 A.2d 807, 810 (1974) (quoting *Gilbough v. West Side Amusement Co.*, 64 N.J. Eg. 27, 28–29, 53 A. 289, 289 (1902)).

Noise can be a nuisance if it "unreasonably interferes with a person's use and enjoyment of his property." 114 R.I. at 129, 329 A.2d at 810. The time when the noise is generated should be considered. *Id.* The noise must be unreasonable to rise to the level of a nuisance, and reasonableness is a question of fact. *Id.*

A review of the record reveals that the resident manager of the Biltmore, located a few blocks east of Gimmicks's tavern, testified that in 1990 and 1991 hotel guests complained that the noise generated by the outdoor entertainment was preventing them from getting a sound, restful sleep. According to the resident manager, efforts by Gimmicks to reduce the noise level did not make a noticeable difference.

The assistant manager of the Biltmore, originally presented by Gimmicks as a wit-

ness, testified that she recalled receiving numerous complaints from hotel guests about the noise disturbing their sleep. She also recalled that when some of those same guests called in 1991 to make reservations they were concerned about the noise again disturbing their sleep.

Sergeant MacDonald of the Providence police testified that the noise in 1991, the year Gimmicks alleges that it took steps to correct the problem, was loud enough inside a Biltmore room to be very annoying and that he would have a serious problem with paying money to stay in a room under those circumstances. Klegraefe, the tavern's proprietor, admitted that she was aware that guests staying at the Biltmore and people living in the nearby Regency, had complained about the sound in 1990 and 1991. Klegraefe's son admitted that he was aware that neighbors had complained about the noise level in both 1990 and 1991.

Relying upon a review of the record, we conclude that legal evidence exists to support the board's ruling.

## II

The next issue before us is whether the board's decision was made upon unlawful procedure or errors of law. Gimmicks contends that the board did not provide Gimmicks with a full and fair hearing on its application for an outdoor-entertainment license. We disagree.

■ The hearing was conducted on three separate days, June 17 and 26 and July 15, 1991, and lasted approximately nine hours. Gimmicks, represented by legal counsel, was permitted to subpoena witnesses and documents, to present witnesses, to conduct cross-examination of the objectors' witnesses, to object to the admission of evidence, and to make a closing argument. A final order, setting forth findings of fact and conclusions of law, was issued. A review of the record indicates that there was legal evidence to support the board's ruling. A review of the final order confirms that the board properly placed the burden of persuasion upon the objectors. We find absolutely no basis for concluding

that Gimmicks has not been provided a full and fair hearing as required under the Administrative Procedures Act, G.L.1956 (1988 Reenactment) §§ 42–35–9 through 42–35–14.

## III

The third issue before this court is whether the board's decision not to grant an outdoor-entertainment license constituted a permissible time, place, or manner restriction on Gimmicks's presentation of music.

■ A licensing authority may impose reasonable restrictions on the time, place, or manner of presenting music, provided the restrictions are justified without reference to the content, are narrowly tailored to serve a significant governmental interest, and leave open ample alternative channels for presenting the music. *Ward v. Rock Against Racism*, 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989).

■ Determining if the restriction is content neutral requires an inquiry into whether the licensing authority has adopted the restriction because of its disagreement with the message the music conveys. *Id.* at 791, 109 S.Ct. at 2754, 105 L.Ed.2d at 675. A review of the record here reveals that the board denied Gimmicks's application because the noise level constituted a nuisance to those in the neighboring area attempting to sleep. The content of the music was never an issue. It is clear, therefore, that the board's action was content neutral.

■ The government has a " 'substantial interest in protecting its citizens from unwelcome noise' " especially when it "seeks to protect 'the well-being, tranquility, and privacy of the home.' " *Id.* at 796, 109 S.Ct. at 2756, 105 L.Ed.2d at 678–79. Insofar as a hotel is intended to provide opportunities for rest and sleep, we would certainly equate a hotel with a home in this discussion.

■ We believe the board's action was a narrowly tailored restriction that serves a significant governmental interest, namely protecting persons from unwelcome noise. Gimmicks is still free to present music inside its tavern where the noise does not

disturb people in the area who are attempting to sleep. The board's decision has left open alternative channels for presenting music and has no effect on the quantity or content of the music presented because Gimmicks may still present bands inside its tavern.

In summary we find that the board's decision to deny Gimmicks's application was content neutral, was designed to serve a significant governmental interest, and provides for an alternative means of communication. Therefore, the board's decision constituted a permissible time, place, and manner restriction on Gimmicks's presentation of outdoor music.

### IV

■ Gimmicks also challenges the constitutionality of G.L.1956 (1987 Reenactment) § 5–22–5. However, Gimmicks has failed to comply with Rule 32(b) of the Supreme Court Rules. Gimmicks failed to provide this court with notice in writing of the existence of a constitutional question so that the clerk in turn could certify the question to the Attorney General of Rhode Island. Inasmuch as Gimmicks has failed to comply with Rule 32, the argument raised is not properly before us, and thus it will not be addressed.

For all these reasons the petition for certiorari is denied. The writ heretofore issued is quashed, and the papers of the case are remanded to the Providence Board of Licenses with our decision endorsed thereon.