[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
DECISION
The matter before the Court is a nuisance action in which plaintiffs seek declaratory and injunctive relief and compensatory damages for harm allegedly caused by the defendant, Town of Lincoln, due to Lincoln's placement and operation of a sewage pumping station on land adjacent to plaintiffs' home. The matter was tried before the Court sitting without a jury.
Plaintiffs are the owners of real estate located at 31 Maria Street, Lincoln, Rhode Island. On or about February 15, 1988 Lincoln, in connection with a sewer installation project, commenced construction of a sewage pumping station in direct proximity to plaintiffs' residential dwelling. Plaintiffs were given no notice of the proposed pumping station prior to the commencement of construction. Indeed, testimony adduced at trial established that in 1987 plaintiffs undertook a costly addition to their home and inquired of the Town if it was interested in selling the land on which the pumping station is now located. Plaintiffs extended their home to include a 34' x 22' family room, 1 1/2 car garage and master bedroom above the garage. According to plaintiffs this construction necessitated a zoning variance of which the Town, as an abutter, was given actual notice of their variance application. Construction of this addition was completed in October, 1987. Lincoln began construction in February, 1988.
In the face of plaintiffs' objection to the location of the pumping station, the Town maintains it moved it. However, Lincoln acknowledges this did not result in the location any further away from plaintiffs' home. It is located 26 feet from plaintiffs' property line.
Plaintiffs maintain they have experienced and are experiencing significant problems of odor, noise and vibrations from the operation of the pumping station and from a diesel powered generator which serves as a back-up power source.
Mr. Donald D'Anjou, the supervisor of the Lincoln Sewer Department testified. He described the sewer pumping station as consisting of a wet well measuring four feet by six feet and a dry well measuring six feet by eight feet along with a centrifugal pump. Both the wet well and the dry well have fans which circulate the air into the building which houses them. There are vents in this building which vent this air into the atmosphere. A deodorizing system was installed by Lincoln which consists of canisters of a substance vaguely described as "all-natural." No one from Lincoln could adequately describe this deodorizing system, how it operates or what substance it emits.
According to Mr. D'Anjou, the effluent flows into the pump station and passes through a grate into the wet well. Any solids contained in the effluent are screened out and trapped on the grate. When the liquid in the wet well reaches a certain level, the pump turns on and the effluent is pumped out of the well into a pressure line and presumably travels to the treatment plant.
The solid waste material that is collected on the grate is allowed to remain there and is raked out only once or twice a week. The grate is then washed down with a hose.
Mr. Richard Chiodini testified that he is a civil engineer with Sigmund Associates and served as project engineer for the Lincoln sewer installation project. Mr. Chiodini personally designed all pumping stations for this project, including the Maria Street pumping station. He testified this pumping station was designed to accommodate over 550 dwelling units with a pumping capacity of 550 gallons per minute. It consists of two 40 h.p. motors which operate 2 pumps which are housed in a concrete chamber. All mechanical equipment is located in a second chamber. Each chamber measures 9 sq. ft.
The motors are powered by electricity with a back-up diesel powered generator. According to Lincoln, the generator operates during periods of electrical failure and is tested weekly for ten minutes.
Mr. Robert Schultz, Lincoln's Director of Public Works contradicted Mr. Chiodini and testified the pumping station was designed to service 200 to 225 homes and that 120 homes are presently connected; he said they are presently at slightly more than half capacity. According to Mr. Schultz, the pumps are designed to turn on when the effluent level reaches 6 feet and remains on until the level is reduced to 3 feet. He estimated it would take 6 hours for the level to again reach a point where the pumps operate. What is clear from this testimony is that at least three feet of effluent is always sitting in this well and is readily exposed to the atmosphere. According to Mr. Schultz this effluent sits inside the two chambers for 3 to 4 hours before it is pumped to the treatment plant. These chambers are ventilated into the atmosphere by an exhaust fan and a 6 inch pipe located at the front of the shelter.
Much testimony concerned the decision by Lincoln to locate the pumping station on Maria Street. It is undisputed that Lincoln already owned the lot on which the pumping station is located. Mr. Chiodini and Mr. Schultz both admitted that there were alternative locations which would not be in such close proximity to a dwelling unit but would require the Town to exercise its eminent domain authority and, of course, respond in damages. Mr. Schultz testified that the original plans were changed to require the placement of the pumping station to be further away from plaintiffs' home. He testified it is located 26' from plaintiffs' lot line but he did not know how far it is from plaintiffs' home.
Mr. Chiodini admitted that while the pumping station was relocated, this alteration did not result in the location of the facility any further from plaintiffs' home. Indeed, Mr. Chiodini admitted that the proximity of the Blackstone Canal and a requirement imposed by the State Department of Environmental Management ("DEM") that the pumping station be located 50 feet from the canal played a major role in the location of the Maria Street station. Any proposed location closer than the 50 foot buffer and further from plaintiffs' home would have required an application for a wetlands permit from DEM. Rather than undertake such an application, Lincoln chose to locate the sewerage pumping station closer to plaintiffs' bedroom than to the Blackstone Canal.
Plaintiff, Steven Harris, testified that from its inception, the sewerage pumping station has unreasonably interfered with the use and enjoyment of his property and has had an adverse impact upon his health. According to Mr. Harris, the operation of the diesel generator results in excessive noise, vibration and diesel fuel fumes. These fumes migrate into his home, especially when the generator operates for long periods of time during power outages which can last for several hours or days. He described these fumes as "heavy, toxic fumes similar to fumes from a diesel truck, like a mack truck next to your door." He also testified the generator creates a loud engine noise and "sounds like a diesel truck in the morning." This noise causes the windows to rattle and the furniture to vibrate.
In addition to the diesel fumes, Mr. Harris testified the pumping station constantly emits a noxious odor "similar to raw sewerage." These sewerage odors are a constant source of discomfort, especially in the summer months.
These problems have significantly altered the manner in which the Harris family uses their property. According to Mr. Harris, they can only be outside for a limited length of time, they have no company and must prohibit their children from playing outside because of the fumes and odors. Mr. Harris testified that the deodorizing system installed by Lincoln resulted in a perfume smell and more chemical odors.
He stated that prior to the installation of the sewerage pumping station the family enjoyed the use of a backyard swimming pool and family and neighborhood cookouts. He testified that prior to the installation the family home was not air conditioned. According to Mr. Harris, the family no longer has cookouts and purchased air conditioners for their home in an effort to improve its ventilation.
Mr. Harris maintains his health has deteriorated as a result of exposure to the diesel fumes, sewerage odors and chemical smells. He stated he suffers from headaches, sinus problems, nausea and vomiting. He has been treating with Dr. Joseph F. Alessi since 1989 for chronic sinus infections.
Dr. Alessi testified that he has been treating Steven Harris for sinus infections and sinus swelling since January, 1989. In his opinion this chronic problem is caused by some outside influence. According to the medical expert, there was no record of problems before 1989 but beginning on December 22, 1989, Steven Harris was treated numerous times for sinusitis, bronchitis and ear infections. He was ultimately referred to an ear, nose and throat specialist who confirmed Dr. Alessi's findings that Steven Harris suffered from mucopurulent sinusitis and possible polyps; total mucosal airway blockage on left side consistent with sinusitis. These conditions were treated with antibiotics and decongestants, but continued to reoccur. This led to another referral to an allergy specialist who concluded plaintiff tested negative for the usual allergies. According to Dr. Alessi, the plaintiff's history suggested he was bothered by these symptoms at certain times of the day and not all day. Plaintiff reported he was well at work, but became sick in the evening although this would occur after a few hours.
Dr. Alessi has concluded the cause of these problems is exposure to chemical fumes and toxicants which causes chronic low level congestion and leads to infections.
Lincoln strongly disputed the allegation the pumping station was the cause of plaintiff's medical problems. Lincoln presented the testimony of Dr. John Pella whose specialty was pulmonary medicine. Dr. Pella treats patients who suffer from airborne irritants. Dr. Pella conducted a review of Mr. Harris' medical records and concluded there was inadequate data to support the conclusion plaintiff suffered from a level of toxic poisoning. Dr. Pella maintains the testing does not sufficiently exclude other conditions that could cause these problems.
Lincoln also presented the testimony of Dr. Anthony Barone, an ear, nose and throat specialist. Dr. Barone examined Steven Harris on October 1, 1992 and found he was symptom free at that time. Dr. Barone also reviewed plaintiff's medical records.
Dr. Barone's opinion was somewhat inconclusive although he stated plaintiff was suffering from mild nasal congestion of unknown origin and although he exhibited no upper respiratory infection, that day he was suffering from chronic viral syndrome which raised the question of allergies. Dr. Barone testified the tests were insufficient to lead to a conclusion plaintiff's medical problems were connected to the sewerage pumping station.
Plaintiff Denise Harris testified that since the installation of the sewerage treatment plant the sewerage odor has increased over a period of time. She said it is difficult for her family to spend time outside the house and enjoy their property to the degree they did so before the pumping station was installed. She compared the odor to raw sewerage and testified she smelled it each and every day but noted it was worse during warm weather. She testified she has had to drastically curtail her outside activities and only gardens a few times per month as compared to daily gardening activities before the pumping station was installed.
She limits her children to 1/2 hour to 1 hour in the backyard because the stench is so bad. She stated the neighborhood parents won't allow their children to play at her house or use the pool because of odor and fumes.
When the diesel generator is running, she experiences thick black smoke in the air which causes her eyes to burn and prevents her from being outside at all. Vibrations are also caused by the generator according to Mrs. Harris and are felt inside the home from the operation of the pumps. Diesel fumes can be detected inside her home.
According to Mrs. Harris, the generator disturbs her sleep and that of her family, especially after hurricanes and bad storms when the family is unable to run the air conditioners.
According to Mrs. Harris, due to increased use of the pumping station the noise, odors and vibrations have increased tremendously since the pumping station became operational. She disputes Lincoln's position that the diesel generator only runs once a week for 10 minutes for testing. She stated that during the 10 days preceding her testimony, the generator ran three times, once for 25 minutes and for 6 hours during a storm.
Plaintiffs presented the testimony of several friends and neighbors, some of whom live in close proximity to the Harris family. Mr. Norman Desmaris of 467 River Road, Lincoln testified that he has visited plaintiffs' home at least twelve times during the past year and has experienced odors on several occasions. He described the odors as a stench, "like an open sewer or an open septic tank." He testified the odor was worse in the summer than in the winter. During the summertime the odor is very strong and that while he didn't become ill he has experienced nausea and "pre-headache symptoms" a couple of times per week from the odor.
Mrs. Annette Roskowski of 27 Maria Street testified there is one house between her home and the pumping station. She stated she has been to plaintiffs' home frequently and has noticed a sewerage smell depending on the direction of the wind and how warm the weather was. She also stated that if Lincoln's trucks were at the facility, the odor would be so strong her son would cover his face and gag."
She testified that once, during a hurricane, she heard the generator operating and that it sounded like a train. She described the noise as "very, very loud" She recalled a "diesel heaviness, as though I could feel it while I was breathing it in."
Mrs. Elaine Lemire of 17 Maria Street testified that 5 homes separate the Harris home from her home. She stated she has visited the Harris home hundreds of times and has experienced a very strong sewerage odor on many occasions. Also, when the generator is running she has experienced noise and vibrations which sound and feel "like an 18 wheeler truck that was running." She described this as a loud noise and compared the vibration to standing next to a big truck. She also testified that when the diesel generator was running she smelled diesel fumes which she described as a "motor odor." Mrs. Lemire stated she experienced this noise, odor and vibrations inside the home when the door to the patio was open.
Mrs. Jacqueline C. Waldon of 11 Barber's Way testified she knows the plaintiffs and has visited their home several hundred times. She has experienced strong odors, "like an overflowing cesspool." She stated the stench is very, very strong during the summer and at other times there was just a hint of it in the air, depending on the wind and the humidity.
She described the operation of the diesel generator as very loud, "as loud as a train" and stated the vibration is similar to a piece of machinery. She testified the generator was running from 10% to 20% of the times she was at the location.
She testified she has experienced odors inside the home but it was not as strong as the odors one experienced while outside the home, although she testified that inside the addition the plaintiffs constructed the odor was very strong.
Finally, Kimberly Antaya, a former babysitter for plaintiffs' children testified about the extent of the odors. She described the odor as nauseating to a degree that she and the children were unable to go outside the home. She stated that when she was outside with the children their eyes would burn and she and they would suffer from severe headaches which forced them into the house. She described the smell as that of sewerage, like one was constantly changing diapers. Miss Antaya has been at the home at various times of the day during the entire year and still visits the children once or twice a month. She acknowledged there are times when there is no odor detectable.
With respect to noise, she stated that the noise is noticeable when the pumps are operating. This noise can be aggravating and is always in the background when one is inside the house. While outside, the noise sounds like a car running.
Miss Antaya stated she was at the home only once when the generator was operating. She described this noise as quite loud, "like a diesel truck." She also noticed the smell of diesel fumes inside the home and described the vibrations as strong enough to cause the furniture against the wall to move and windows to vibrate.
Despite the fact the Court granted the parties several continuances and, over plaintiffs' objections, allowed the defendants to call other neighbors as witnesses who were not listed in discovery, Lincoln was unable to produce such testimony. Lincoln attempted to rebut the neighbors' testimony by offers of proof which the Court has rejected.
Lincoln does, however, strongly dispute the plaintiffs' assertions regarding odor, diesel fumes and excessive noise and vibration. Mr. Schultz, Lincoln Director of Public Works, testified he has been to the site on many occasions since it became operational. According to Mr. Schultz he has not experienced any odors beyond the property line. He denies there are any odors detectable on plaintiffs' property. He states the pumps are centrifugal pumps which cause no vibrations.
Mr. Schultz acknowledged there is noise within the structure Lincoln has erected over the pumping station but stated he is aware of no pump noise outside this shelter. Likewise, he acknowledged the existence of odors on the site itself but stated these odors are ventilated by the circulation of air across the sewerage in the open pit and dispersed into the atmosphere around the pumping station. Mr. Schultz stated that Lincoln installed an odor control system but could not adequately explain what this product was or how it worked. Nor could he explain whether this product itself could be a possible irritant.
With respect to noise and fumes from the generator, Mr. Schultz admitted that one can hear the generator from the inside of plaintiffs' home. He described the sound as "negligible background noise" which in his opinion should not interfere with activity within the house.
Mr. Donald D'Anjou, Lincoln's Supervisor of the Sewer Department, testified that he has detected no odor when he has been at the site. He described the deodorizing system as a liquid canister that pumps the product from the dry well to the wet well. This product is made up of "an all natural" grass substance.
Mr. D'Anjou denies there is any detectable noise from outside the building and states there is no noise on the lot line. Further, he acknowledges there is noise from the diesel generator but denies it is loud or can be heard outside the shelter.
He stated the diesel engine produces no vibration at the site and any diesel exhaust is vented into the atmosphere around the pumping station in the same manner as the chamber is ventilated.
Mr. D'Anjou testified the pump station is serviced by a 10 inch gravity fed line from which the effluent flows into the pumping station. He stated that 475 times a day this sewage is pumped through a pressurized line until it reaches a gravity line. Mr. Chiodini later denied there was a problem of digestion of the material in the line before it reached the chamber.
Lincoln presented the testimony of Mr. Russell F. Geisser, a consulting engineer retained by the town to conduct noise vibration and air quality testing at and around the Maria Street pumping station. Mr. Geisser testified that on April 26, 1989, which he described as a fairly calm day with a wind velocity of only 5 m.p.h., he conducted noise tests through a Dallas Instruments Acoustic Monitor, vibration tests with a Dallas Instruments Susmic Monitor and a chemical analysis with a Mathewson Kitagawn Gas Monitor. These tests were performed at various locations in and around the site including inside plaintiffs' home.
The noise measurements with the pumps operating were less than 60 decibels at the pump station and inside and outside the residence. Mr. Geisser testified this was an acceptable level of noise. However, when the generator was operating, the noise level increased to 67 decibels inside the house, 74 decibels outside the house and 83 decibels at the pumping station. In his opinion, 83 decibels is quite high and is objectionable; 73 decibels is similar to the sound of a vacuum cleaner and 67 decibels approximates the sound of an automobile passing the house.
Both the chemical testing and vibrational testing proved negative.
Since April 26, 1989 the Town of Lincoln has conducted no other testing.
In addition for a claim of nuisance plaintiffs maintain the sewerage pumping station as resulted in a loss of value of their home. Plaintiffs allege this loss in value amounts to a constructive taking or an inverse condemnation without compensation.
The plaintiffs presented the testimony of Jo-Anne Siminski, a real estate broker licensed in the State of Rhode Island. Ms. Siminski testified that the location and operation of the sewerage pumping station had an adverse effect upon the market value of the Harris home. She described this as a negative situation which would have to be disclosed to a potential buyer. While she acknowledged she is not a professional real estate appraiser, she stated she has significant experience in the sale of real estate in the Blackstone Valley. Ms. Siminski performed a market analysis of the Harris home by compiling data about the home such as square footage, number of bedrooms and baths, location, condition and amenities. This data was then fed into a computer program provided by the State Multiple Listing Service.
This resulted in a value estimate of $225,000.00 without the sewerage pumping station. She then considered the pumping station as a negative factor such as living by a fire station, police station or highway. She thereupon placed a value on plaintiffs' home of $174,900.00, or a diminution of value of approximately $50,000.00.
Lincoln presented the testimony of Mr. William E. Coyle, Jr., a licensed real estate appraiser. Mr. Coyle noted that no house had sold on Maria Street for more than $175,000.00 He also stated in his opinion the location and operation of the pumping station has no adverse effect upon the value of the Harris home. Mr. Coyle based his opinion on his conclusions there was no odor created by the pumping station and no noise problem. He cautioned, however, that to the extent odor and noise were observed, those factors would result in a diminution in value. It is clear that Mr. Coyle's testimony was based on his determination that odor and noise were not present at the site. The Court does not agree.
Finally, Lincoln argues that if the Court finds that it has created a nuisance, the only remedy available is money damages. Lincoln maintains that in fashioning an equitable remedy, the Court must consider whether the injury complained of is outweighed by the injury to the defendant if a mandatory injunction were issued. Lincoln asserts its interests and the interests of the public at large outweigh the plaintiffs. However, despite numerous warnings by the Court, Lincoln presented no evidence in support of this argument. Lincoln argues a mandatory injunction to relocate the pumping station would shut down the Town's sewer system for hundreds of residents. There is no evidentiary support for this broad statement. The Court rejects this argument.
An actionable nuisance arises from the use of one's property in such a manner as to interfere with the use and enjoyment of neighboring property. Citizens For Preservation of Waterman Lakev. Davis, 420 A.2d 53 (R.I. 1980). The essential element of an actionable nuisance is that the "plaintiffs have suffered harm or are threatened with injuries that they ought not have to bear."Wood v. Picillo, 443 A.2d 1244 (R.I. 1982). A private nuisance involves a material interference with the ordinary physical comfort or the reasonable use of one's property. Iafrate v.Ramsden, 96 R.I. 216, 190 A.2d 473 (1963).
The Supreme Court has recognized that noise, particularly during the nighttime, in and of itself can be a nuisance if it unreasonably interferes with a person's use and enjoyment of his property. De Nucci v. Pezza, 114 R.I. 123, 329 A.2d 807 (1974). Liability is imposed only in situations in which the harm or risk to a person is greater than he ought to be required to bear.Citizens For Preservation of Waterman Lake v. Davis, supra at 59.
Where the Court finds the existence of a nuisance, injunctive relief in the form of a permanent injunction is the proper remedy. Wood v. Picillo, 443 A.2d 1244 (R.I. 1982) where the withholding of such relief will lead to harm to the health and safety of the plaintiffs. Town of West Greenwich v. SteppingStone Enterprises, Ltd., 416 A.2d 659 (R.I. 1979).
Additionally, where the harm suffered by the plaintiffs resulted in an inverse condemnation, plaintiffs are entitled to compensation in the form of money damages. E J, Inc. v.Redevelopment Agency of Woonsocket, 122 R.I. 288, 405 A.2d 1187
(1979).
Our Supreme Court has stated that governmental action short of actual acquisition of property "may be a constructive taking or an inverse condemnation within the meaning of the Fifth and Fourteenth Amendments if such action deprives the property owner of all or most of his interest in the subject matter." E J,Inc. v. Redevelopment Agency of Woonsocket, 122 R.I. 288,405 A.2d 1187 (1979). To recover damages plaintiff need not be actually removed from his property but must merely show that an interest in the property or in its use and enjoyment be seriously impaired. Id. Where, as here, plaintiffs demonstrate that defendants conduct has interfered with the use and enjoyment of their property over a substantial period of time, plaintiffs are entitled to just compensation.
Accordingly the Court makes the following findings of fact and conclusions of law:
 (1) The Court finds plaintiffs have sustained their burden of proving the location and operation of the Maria Street sewerage pumping station is a private nuisance which unreasonably interferes with plaintiffs' use and enjoyment of their home.
 (2) The Court finds the pumping station to be designed and operating in such a way as to cause unacceptable odor of sewerage or septage.
 (3) The Court finds the retention of human effluent in a wet well for several hours in a facility directly proximate to a residential dwelling to be an unreasonable use of one's property.
 (4) The Court finds the Harris family has experienced and in the absence of relief, will continue to experience, noxious and insulting odors both inside their dwelling and to a greater degree while outside their home.
 (5) The Court finds the noise created by the pumps to be an unreasonable and constant intrusion upon the peace and enjoyment of this family.
 (6) The additional noise and diesel fumes associated with the operation of the diesel-powered back-up generator is unacceptable and the Court finds poses a substantial risk to the health and safety of the plaintiffs and their family.
 (7) The Court accepts the testimony of the plaintiffs with respect to the level of noise and odor associated with the pumping station and the diesel generator.
 (8) The Court rejects the testimony of Mr. D'Anjou, Mr. Chiodini and Mr. Schultz that there have been no odor or noise problems associated with the Maria Street station. Were this the case then Lincoln would not have erected a wooden shelter and installed an air-chem deodorizing system at the site.
 (9) The testimony of the neighbors and babysitter of the plaintiffs the Court finds to be reliable and credible. Specifically, the testimony of plaintiff Denise Harris and Kimberly Antaya as to how the children were affected by the noxious fumes and how their time outside was restricted is credible and clearly demonstrates this facility has unreasonably interfered with the life of this family. This is a condition no one ought to bear, particularly in the sanctity of one's home.
 (10) The Court finds the testimony of other neighbors and friends who have visited the Harris home on numerous occasions to be reliable and credible. Specifically, the Court accepts as true the testimony of Norman Desmaris as to the extent of the odor and that of Annette Roskowski as to the stench of sewerage and the level of noise associated with the operation of the diesel generator. Likewise, the Court accepts the testimony of Elaine Lemire who has visited the Harris home on hundreds of occasions and has experienced the full panoply of odors, noise and vibrations. This evidence clearly demonstrates an on-going nuisance which has continued for many years.
 (11) The testimony of Russell F. Geisser has little, if any, probative value as to the existence of an actionable nuisance. Mechanical testing for noise, gas and vibrations on a single day in April, 1989 does not approach a scientific study and is of little assistance to this Court. The Court is without any evidence as to the number of homes were actually being serviced on that day, what the level of effluent was in the wet wells, how frequently it was pumped and without any reliable data with which the Court could make a valid comparison of conditions on April 26, 1989 and conditions today. The Court notes that Mr. Geisser himself found the noise level from the operation of the generator to be unacceptable. The Court agrees. The Court notes that Lincoln failed to conduct a single test since April 26, 1989.
 (12) The Court concludes and finds the operation of the Maria Street pumping station to be a private nuisance and one which poses a risk to the health, safety and peaceable existence of the plaintiffs and their family.
 (13) The Court finds the operation of the Maria Street pumping station has deprived the plaintiffs of the reasonable use and enjoyment of their home since it became operational. Accordingly, the plaintiffs are entitled to be compensated for the taking by inverse condemnation of their property by Lincoln.
 (14) The Court has scrupulously and conscientiously reviewed the evidence in this case and after such an exercise is compelled to conclude that significant property interests belonging to the plaintiffs have been ursurped by the Town of Lincoln.
 (15) These property interests relate to unreasonable interference with the daily life of this family due to odor, noxious fumes, and noise. Further, Lincoln has deprived the plaintiffs of the use of large areas of their home and almost totally evicted them from the backyard and garden of their premises because of odor and noise.
 (16) The Court concludes that a monthly assessment of damages is both reasonable and just compensation due to the continuing nature of the nuisance and type of interference suffered by the plaintiffs who not only lost the use of large areas of their realty but were continually subjected to noxious fumes and noise.
 (17) In light of the injunctive relief granted the Court defers ruling on whether or not the plaintiffs' property has suffered a loss in market value.
Wherefore, the Court finds the plaintiffs, having sustained their burden of proof, are entitled to both injunctive relief and money damages.
Defendants are permanently enjoined and restrained from locating and operating a sewerage pumping station at the Maria Street location. This Court will retain jurisdiction of this matter. Defendants shall have forty-five (45) days from the date of this decision to develop plans to relocate the Maria Street pumping station or for a suitable alternative to this site for sewerage pumping. These plans shall be made available to counsel for the plaintiffs within forty-five (45) days of the date of this decision.
The Court, having found plaintiffs have been deprived of significant property rights and are entitled to recover, on a monthly basis, the value of the property taken by the defendants and for the interference with the use and enjoyment of their home, awards the plaintiffs the sum of $400.00 per month for each month of operation. This award of just compensation will continue until this nuisance is abated.
This matter is continued until October 1, 1993 for hearing.
Counsel for the plaintiffs shall prepare an order consistent with this decision.