DECISION
This matter was tried before the Court without a jury on Plaintiffs' Complaint alleging that the use of an outdoor wood-burning hydronic heater ("OWB") operating on and servicing Defendants' property in Foster, Rhode Island, constitutes a private nuisance and a continuing trespass. Plaintiffs also contend that Defendants are liable for negligence in the operation of the OWB, which is located across the street from Plaintiffs' residence. Plaintiffs seek a permanent injunction[1] to enjoin Defendants from operating the OWB in any manner. The trial proceeded on liability only, with the parties stipulating that Plaintiffs' damages, if any, would be tried separately.
This Court has jurisdiction pursuant to G.L. 1956 § 8-2-13 and renders its decision in accordance with Rule 52 of the Rhode Island Superior Court Rules of Civil Procedure.
 I Facts and Travel
Plaintiffs, Stephen and Susan Charette ("Mr. Charette" and "Mrs. Charette"), have owned and resided at 2B Burgess Road in Foster since 2004. Their property consists of 6.5 acres and is a corner lot; Burgess Road is immediately to the west of Plaintiffs' property and Hartford Pike is *Page 2 
immediately to the north. There are at least two structures on the property — a contemporary split-level house facing Burgess Road and a detached barn located in the side yard to the south of the house. The highest peak of Plaintiffs' house is 24.5 feet above grade, with the lower peak measuring 16.4 feet above grade. A number of front-facing windows on Plaintiffs' residence do not open.
Defendants own and reside across Burgess Road and directly west of the Plaintiffs' home. Defendants have resided at 2A Burgess Road since approximately 1994. Their property is a 4.95-acre corner lot abutting Burgess Road to the east and Hartford Pike to the north. Defendants Louis J. Pezza and Isabelle C. Pezza are the parents of Defendant Louis J. Pezza, Jr. ("Louis Pezza"), and live in an in-law apartment within the two-story residence. Louis Pezza and his wife, Sarah Pezza, reside in the main part of the residence.
For health reasons, the elder Pezzas require the heat in their living area to be maintained at a higher temperature than the remainder of the house where Louis and Sarah Pezza reside. Defendants' property is currently serviced by an oil furnace that is over fifteen (15) years old. In an effort to save money on heating costs in the fall and winter months, and to avoid the costly replacement of the existing oil furnace, Defendants purchased and had installed the OWB on the eastern side of their property in the summer of 2008 at a cost of approximately $15,000. Louis Pezza expected that it would take three (3) years of operating the OWB to recoup the money spent on the OWB and its installation by not having to purchase home heating oil. The OWB is located 55' from the Defendants' own residence, 15' from the edge of Defendants' property, 30' *Page 3 
from the edge of Plaintiffs' property, and less than 200' from Plaintiffs' house.[2] Plaintiffs' property is at a grade seven feet (7') below Defendants' property.
Generally, an OWB is a wood-burning appliance that converts wood fuel to heat. More specifically, the OWB installed on Defendants' property is a Central Boiler, Inc., Classic Model 6048 ("Model 6048"), and is recognized in the industry as a mid-sized residential unit that is designed to be fueled by hand by loading wood through a door into the combustion chamber. When the wood burns, the heat from the combustion chamber in turn heats a water jacket surrounding the combustion chamber; the water jacket is attached to a series of pumps and piping which connect the device to an indoor heating system servicing Defendants' residence. The OWB releases steam and smoke from the combustion chamber through a metal smokestack attached to the structure; the top of the smokestack on Defendants' OWB measures 18' above the ground.
Twelve witnesses testified before the Court, including Plaintiffs, Defendant Louis Pezza, Sarah Pezza, and six (6) other Foster residents, four (4) of whom reside on Burgess Road and one being the Town Solicitor. Expert testimony was also presented on behalf of Plaintiffs as well as Defendants.
 A Summer 2008 Mr. Charette testified that he was aware that Defendants — whom he described as "neighborly" up until that time — had installed their OWB in July, 2008. At that time, he observed a trench being dug on Defendants' property and testified that Louis Pezza became "instantly defensive." *Page 4 
Recalling one day in late August, 2008, Mr. Charette testified that he first noticed Defendants' OWB in operation when he returned from work to find his home engulfed in smoke with all the smoke detectors sounding off. Notwithstanding this first incident, Mr. Charette acknowledged that the smoke detectors in Plaintiffs' home never sounded again due to smoke from Defendants' OWB, even on what Mr. Charette characterized as being the worst episodes of smoke. Mr. Charette described the smoke and odor on that first occasion as "disgusting," "like a car on fire," and "unlike smoke from a fireplace or a woodstove."
Mrs. Charette testified that she first observed emissions from Defendants' OWB in June or July, 2008. She experienced an odor while on the back deck of her home one afternoon and immediately went in to close the sliding doors. Plaintiffs also recalled a nighttime incident in August, 2008, during which their twin sons, then 3-years old, awoke crying and coughing due to smoke that had entered Plaintiffs' home.
The next business day following Mrs. Charette's first observations, Mrs. Charette visited Foster Town Hall to complain about the smoke from Defendants' OWB. She stated that the Town did not have any knowledge about OWBs. Mr. Charette testified that Town officials would not allow his wife to make a formal complaint. Mr. Charette subsequently contacted the Foster Building Official, the Rhode Island Department of Environmental Management, the Rhode Island Department of Health, and the Rhode Island Attorney General, with no official action taken by any entity or individual. According to Mr. Charette, Foster Town Solicitor John Bevilacqua advised Mr. Charette that the Town would shut down Defendants' OWB and create laws to regulate it. At trial, Mr. Bevilacqua disputed that he made such representations. To the contrary, Mr. Bevilacqua recognized that upwards of fifty (50) OWBs are in operation in Foster, some of which have been in operation for many years. *Page 5 
Mrs. Charette testified that just after her visit to Town Hall, she observed Louis Pezza "barreling down the driveway beeping." She described him as irate and testified that he demanded that she inform Mr. Charette that he wanted to speak to him. Mrs. Charette testified that she was offended by how Mr. Pezza belittled her and she informed her husband that he was not to go over to speak with Louis Pezza.
Louis Pezza testified that after installing the OWB in accordance with the instructions, he used the OWB in late August, 2008, only as a dry run before the colder weather set in. At that time, Mr. Pezza used unseasoned pine wood to fuel the OWB, which Mr. Pezza acknowledged created significant emissions and a pungent odor that the Charettes described on that first occasion. He has since used only seasoned, cut hardwood to fuel the OWB, which wood is stacked in the vicinity of the OWB for easy access.
Sharon Franco, a neighbor immediately south of Plaintiffs on Burgess Road, testified that she first observed smoke from Defendants' OWB in May or early June, 2008. She recalled thinking at that time that someone's house was on fire because of the concentrated smoke. She described the smell on that occasion as a "toxic odor," with an oil type of smell. She further described the smoke on that occasion as "like driving through a fog of darkness" which rolled onto Plaintiffs' property. Her husband, Anthony Franco, testified that he first observed significant smoke in the vicinity of Plaintiffs' home in early fall 2008 — not in the summer — when he drove home from work after 9 p.m. and saw smoke in the headlights of cars stopped on Burgess Road. He recalled that he thought there was a fire at Plaintiffs' house, but admittedly did not stop to inquire of anyone else that had been stopped what they knew to be happening. He testified that at that time the smoke was at or near ground level, and he recalled feeling bad for the people next door when he observed that smoke. *Page 6 
From late August to late September, 2008, Defendants did not operate the OWB in any manner. The testimony further reveals that Defendants had not been ordered by any official or entity to cease operating the OWB during that time.
 B Impact on Plaintiffs
In addition to the first observations in the summer of 2008 and until a Consent Order was entered in March, 2009, by which Defendants agreed to cease using their OWB until further order of the Court, Plaintiffs each testified that Defendants' OWB impacted their daily lives. Mr. Charette testified that the smoke from the OWB traveled onto his property and that the odor was the worst smell he ever smelled, comparing it to a situation worse than that which is experienced in third world countries. Mr. Charette testified that he observed smoke from the smokestack of Defendants' OWB "virtually everyday" and that "very rarely does the wind blow anyplace except toward [Plaintiffs'] home." Mrs. Charette also testified that she viewed emissions from Defendants' OWB "virtually everyday."
Plaintiffs each testified that the operation of the OWB forced them to close all their windows and they could no longer play with their children in their yard. Without air conditioning in their home that summer of 2008, the closed windows caused the inside of their home to become very hot in the warm weather. Mr. Charette further stated he was unable to lie in his hammock, rake leaves, shovel his driveway or clean out his barn because of the smell. Additionally, Plaintiffs could not build a snowman or sled on a small hill in their front yard with their young boys all winter.
Even with windows closed, Mrs. Charette testified that smoke permeates into the home daily. Mrs. Charette stated that even when she did not observe smoke, she would not open her windows out of fear that the smoke would suddenly return. For this reason, she would hurriedly *Page 7 
close the doors quickly when she left or re-entered the house, and she would cover her face with clothing to avoid breathing the smoke. Although Mrs. Charette stated that she "got used to the smell," she continued to believe that the effects of the smoke were harmful. She described her life as being a prisoner in her own home. She testified that she was too uncomfortable and embarrassed to invite people to her home because of the emissions from Defendants' OWB.
On cross-examination, Mr. Charette acknowledged that many of the front-facing windows on Plaintiffs' home do not open, that they are less likely to open windows in the winter months and that their children are less likely to play outside in the winter due to the cold weather. For her part, Mrs. Charette testified that because her children were forced to stay indoors to avoid smoke from the OWB, they now "acted differently." In discussing her sons' past play outside, Mrs. Charette further commented that the noise of airplanes in Foster is disturbing.
Mrs. Charette expressed great concern with the safety of Defendants' OWB. Specifically, she stated that anyone could walk up to the OWB, open it up and put anything they wanted into the combustion chamber. She provided emotional testimony that a child could die if he or she opened Defendants' OWB because oxygen would be introduced and smoke would blast out.
Mrs. Charette maintained a journal detailing her observations regarding the OWB from September, 2008 to March, 2009. Although the journal was not marked as a full exhibit, the testimony elicited at trial revealed that Mrs. Charette strongly distrusted Foster Town officials and believed that Louis Pezza was intentionally creating more smoke. *Page 8 
 C Video and Photographic Evidence
Mr. Charette adopted a scale of 1 to 10 to describe the conditions experienced allegedly from the operation of Defendants' OWB, with a rating of 1 representing "trickling" smoke that dissipates, and a rating of 10 being the worst experience with smoke "sitting" on Plaintiffs' property and not dissipating.
To demonstrate what Plaintiffs experienced "everyday," Plaintiffs videotaped several minutes on thirty-six (36) dates from September 23, 2008 through March 9, 2009. (See Defs.' Exs. A and B.) Plaintiffs contend that they could only film a limited number of days and just a few minutes at a time because of their work and childrearing responsibilities. On direct examination, Plaintiffs' testimony was streamlined to address the "worst" conditions that Plaintiffs experienced, utilizing abridged versions of the exhibits introduced in full by Defendants. (See Pls.' Exs. 4 and 5.) Only the video portions were introduced and marked as evidence; this Court denied entry of the audio portion as evidence and the parties complied with such limitations in presenting the respective DVDs[3] to the Court. In Plaintiffs' Post-Hearing Response Memorandum, Plaintiffs characterize the video footage as "the most important evidence in this matter," and they rely heavily on the scenes depicted therein as conclusive proof that emissions from Defendants' OWB constitutes a private nuisance and a continuing trespass. (See Pls.' Post-Hearing Resp. Memo. at 5.)
Notably, of the thirty-six (36) dates filmed over the course of 5½ months of operation, a number of days videotaped reveal a "trickle" of smoke, (see, e.g., Defs.' Ex. A, at 9/28/08, 10/11/08; Defs.' Ex. B, at 3/9/08), smoke blowing in an easterly direction and away from *Page 9 
Plaintiffs' property (see, e.g., Defs.' Ex. B, at 1/30/09), or dark smoke lifting into the air from Defendants' OWB with no documented or discernable effect on Plaintiffs' property. (See, e.g., Defs.' Ex. A, at 9/23/08, 9/24/08, 9/25/08, 10/7/08, 11/2/08, 12/21/08; Defs.' Ex. B, at 1/21/09.) Further, the quality of the video on many days was compromised and made it difficult at best to observe smoke from Defendants' OWB or the effect on Plaintiffs' property due to what appears to be sun glare (see, e.g., Defs.' Ex. A, at 10/13/08, 10/20/08, 10/26/08, 11/21/08, 11/29/08, 12/13/08, 12/23/08; Defs.' Ex. B, at 1/14/09, 1/16/09, 1/17/09, 2/15/09), dark conditions (see, e.g., Defs.' Ex. A, at 9/26/08, 9/29/08, 11/20/08; Defs.' Ex. B, at 1/26/09), or overcast conditions (see,e.g., Defs.' Ex. A, at 9/30/08, 10/1/08, 10/3/08, 10/9/08; Defs.' Ex. B, at 2/19/09).
In addition to the video evidence prepared by Plaintiffs for the purpose of this litigation, Mrs. Charette took two (2) pictures which were introduced into evidence. (Pls.' Exs. 8 and 9.) According to Mrs. Charette, these pictures were taken in late September, 2008, because Defendants had just started operating the OWB again. The pictures reveal sun glare from the south and what Mrs. Charette described as smoke; she also testified that there was an intense smell associated with that smoke. According to Mrs. Charette and using Mr. Charette's scale of 1 to 10, the depiction in Plaintiffs' Exhibits 8 and 9 would be a "7."
Defendants introduced twelve (12) photographs into evidence. (Defs.' Ex. I.) Sarah Pezza testified that she took these photographs on August 2 — 4, 2009, when this trial was underway and when Defendants' OWB was not in operation, and indeed the pictures are date stamped accordingly. Those photographs display some sun glare but, importantly, also reveal a hazy, low-lying denseness in and around Plaintiffs' property. The hazy, low-lying denseness appears to the Court to be similar in several respects to the denseness depicted in Plaintiffs' two photographs (Pls.' Exs. 8 and 9) and to many days of video filmed by Plaintiffs, namely, the lowlying *Page 10 
nature, color, thickness and location in and around the side yard and brush area to the west and southwest of the Plaintiffs' residence. (See, e.g., Defs.' Ex. I; cf., e.g., Defs. Ex. A, at 10/2/08, 10/9/08, 10/13/08, 10/20/08, 10/26/08, 11/9/08, 11/21/08, 11/29/08, 12/13/08; Defs.' Ex. B, at 1/14/09, 1/17/09, 1/30/09, 2/15/09, 2/19/09, 3/9/09.)
 D Plaintiffs' Dog
Plaintiffs testified that even their dog was adversely affected by the emissions from Defendants' OWB. Mr. Charette testified that he wouldn't put his dog in the outdoor dog kennel because the smell was so intense outside. Mrs. Charette testified that she kept the dog inside much more as she did not want the dog to experience the smoke and odor either.
On cross-examination, it was revealed that there was another reason that Plaintiffs kept their dog inside rather than in the outside dog kennel. Specifically, Plaintiffs' dog had been the subject of an appeal to Sixth Division District Court following a vicious dog hearing before the Town of Foster. Town Solicitor John Bevilacqua testified that Mr. Charette was represented by counsel on that appeal and that restrictions were imposed on the dog after conference with the District Court Justice. Mrs. Charette acknowledged on cross-examination that their dog was not permitted to be off-leash outside of Plaintiffs' property, was limited to just 10-15 minutes per day outside, and was to be fenced in or under the supervision of the owner while outside on Plaintiffs' property.
Mr. Bevilacqua confirmed such restrictions, among others, and further testified that the restrictions were imposed on Plaintiffs' dog after Defendant began to use the OWB. Nonetheless, Mr. Bevilacqua testified that based on several telephone conversations he has had with Mr. Charette, Mr. Charette was under the belief that Louis Pezza was the cause of Plaintiffs' dog problems. Louis Pezza testified that although his father was bitten by Plaintiffs' *Page 11 
dog, neither Louis Pezza nor anyone in his family called any Town official concerning that dog bite, and therefore the Pezzas were not responsible for the vicious dog hearing or, consequently, the restrictions imposed on Plaintiffs' dog.
 E Plaintiffs' Campaign to Ban OWBs
The testimony demonstrated that Mr. Charette has not shied away from any opportunity to convince people — legislators, Town officials, and neighbors — of the need to ban OWBs. He has been an outspoken critic of OWBs since Plaintiffs received no official response from any entity they contacted in August, 2008, concerning Defendants' operation of their OWB. The evidence at trial revealed that Mr. Charette testified before the Rhode Island House of Representatives in February, 2009, in support of legislation that would regulate OWBs, and has appeared as a guest on a local radio talk show to discuss OWBs. On cross-examination, he acknowledged that he placed advertisements in circulars and has referred to OWBs as a form of "terrorism."
Steven Young, an 8-plus-year resident of 2 Burgess Road, directly west of Plaintiffs' barn area and south of Defendants' property, testified to the conversations that Mr. Charette attempted to initiate with him. After Mr. Charette left a note in Mr. Young's mailbox asking him to call, Mr. Young recalled from that conversation that Mr. Charette stated that he was "sick of hearing Lou talk about [Plaintiffs'] dog" and that Mr. Charette then complained about Defendants' OWB. Mr. Young also described the conversation as Mr. Charette's attempt to persuade him that OWBs were pollutants and that operating Defendants' OWB was the equivalent of leaving fifty (50) cars running on Defendants' property. *Page 12 
 F Neighbors' Testimony
Plaintiffs presented the testimony of two neighbors immediately to their south, Sharon and Anthony Franco. In addition to describing the first time she observed smoke from Defendants' OWB, seesupra, at I.A, Mrs. Franco testified that during the winter months she could not say whether the emissions improved or that she had become accustomed to the smoke and odor. On cross-examination, she acknowledged that she did not go out walking in the winter months when Defendants' OWB was in operation.
Anthony Franco testified that he walks on Burgess Road everyday, that he frequently observed smoke on Plaintiffs' property, and that the smoke was always low lying. His daily walks occur at different times of the day, and he has seen other OWBs operating on the 1½ mile-long Burgess Road. On cross-examination, he testified that even after Defendants ceased operating the OWB in March, 2009, he still smelled wood burning and noticed smoke from units servicing other properties, including his own woodstove. He acknowledged that he could not definitively say that when he did not see smoke but smelled it or tasted it, that it emanated from Defendants' OWB. He further stated on cross-examination that Burgess Road does get low lying fog, but he observed that low lying fog doesn't smell and that emissions do smell. Mr. Franco stated that sometimes the smell he experienced on Burgess Road was objectionable, but other times it was not.
Defendants presented the testimony of three neighbors on or near Burgess Road, including Defendants' immediate neighbor to the south, Steven Young. Mr. Young testified that many people in the area burn wood, including himself. The Youngs utilize a woodstove to heat their entire house in the winter months and refuel the stove four to five times daily; the *Page 13 
smokestack to that woodstove is 16'-17' above grade and is directly west of the barn area on Plaintiffs' property. At times when Mr. Young has observed smoke emanating from Defendants' OWB smokestack, he experienced a smell that was similar to the smell of wood from a woodstove, a smell with which he is familiar. When asked to describe the difference in smoke emissions from Defendants' OWB and his own woodstove, Mr. Young testified that in his opinion, there was little difference and that Defendants' unit probably emitted less smoke than his own woodstove.
Myra Mercier, a resident of 3½ Burgess Road, southwest of Plaintiffs' property and south of Defendants' property, testified that everyone she knows in the area burns wood, including herself. She walks to her mailbox daily, drives her car frequently on Burgess Road past Plaintiffs' and Defendants' properties, and has observed Defendants' OWB in operation. Mrs. Mercier testified that she never observed smoke entering Plaintiffs' property. Mrs. Mercier testified that the area of Burgess Road frequently experiences ground fog.
Finally, Donald Knox, Jr., a resident of a corner lot on Shippee School House Road approximately ½ mile away from Plaintiffs' and Defendants' properties on Burgess Road, testified that three of five properties adjacent to his are serviced by OWBs, including his own being serviced by an OWB. His own home serves as a daycare for six pre-schoolers, ages 3-4, and he is not aware of any complaints having been made concerning the health of these children. Mr. Knox testified that he has observed Defendants' OWB in operation and testified that the smoke output is similar to the amount of smoke from his own OWB and that of his neighbors' OWBs. Further, he testified that he has never observed smoke from Defendants' OWB crossing over Burgess Road to Plaintiffs' property. *Page 14 
 G Air Quality
The parties presented a great deal of scientific testimony concerning, inter alia, the operations of the Model 6048 OWB, air quality standards, physics, geography, meteorology, and the combustion process. The testimony of the parties' respective experts will be addressed seriatim.
 1 Plaintiffs' Expert Testimony
Plaintiffs' expert, Alan Leston, was presented and qualified as an air quality expert. Mr. Leston was employed for over thirty (30) years by the Connecticut Department of Environmental Protection ("DEP") as an air pollution engineer and in other field enforcement and ambient monitoring positions. (Pls.' Ex. 10.) As the current founder of and senior scientist at AirQuality Research Logistics, LLC, based in Lebanon, Connecticut, he "developed/implemented a field-based fine particle monitoring program to assess the impact of a commercial, outdoor wood boiler on nearby residents." Id. As a supervising air pollution engineer at DEP, he "[d]esigned and oversaw implementation of statewide PM2.5[4] ambient monitoring network based on EPA requirements." Id.
Mr. Leston testified that the firebox, or combustion chamber, of the Model 6048 is thirty (30) to sixty (60) times the size of the firebox of a standard approved woodstove, which is only one (1) or two (2) cubic feet in size. He had studied the Model 6048 in use in two other settings outside of Rhode Island. He further testified that the OWB emits considerably more grams of particulate and gaseous matter per hour than does a woodstove. Mr. Leston testified that woodstoves operate at a much higher rate of efficiency than an OWB so there are less emissions *Page 15 
from a woodstove than an OWB. Per Mr. Leston's testimony, lower efficiency translates into incomplete combustion, greater emissions and higher particulate matter. Further, the effects of incomplete combustion, as experienced in the operation of an OWB, leads to the formation of creosote that builds up in the combustion chamber and smokestack, creating a different quality of smoke and odor in an OWB as compared to in a woodstove, which goes through a complete combustion cycle.
Mr. Leston discussed how an operator of an OWB can affect its efficiency. The timing of refueling, placement of logs, and the condition, size and type of wood used can all affect the efficiency of the unit. Refueling — or restacking wood in the combustion chamber — interrupts the combustion cycle and generates significantly greater amount of particulate matter.
However, he also acknowledged that the federal air quality standards, with which he was familiar, measure particulate matter inconcentration, or micrograms per cubic meter (µg/m[3]), to determine health effects from such particulate matter, and not by quantity of emissions measured by total grams of emissions per hour. The EPA has set a numerical limit of 35 µg/m[3] over a 24hour period as a safe concentration of particulate matter (PM2.5).
Mr. Leston reviewed Plaintiffs' videotaped depiction of smoke from Defendants' OWB while in operation, as set forth on Defendants' Exhibits A and B, and conducted two site visits to the property in question. He observed Defendants' OWB in operation and testified that the smoke and odor were comparable to other OWBs he had observed. He noted that the human nose is generally sensitive to the smell of wood smoke, causing some people to find it unpleasant.
Mr. Leston opined that the emissions from Defendants' OWB impacted Plaintiffs' property from August, 2008 to March, 2009. His opinion was based on the following factors: *Page 16 
relative locations of the OWB and Plaintiffs' residence; obstructions between those structures; topography; height of the OWB smokestack; and the upwind obstructions of the OWB, namely, Defendants' residence. Without objection by Defendants' counsel as being beyond the scope of his expertise, Mr. Leston testified that the prevailing winds from August, 2008 through March, 2009 was from west to east. Because Plaintiffs' residence was due west of the OWB and because Defendants' own home obstructed winds blowing from the west from allowing such winds to dissipate the emissions from the OWB, a region of turbulence (or wake cavity effect) was created. (Pls.' Ex. 12.) Mr. Leston testified that this region of turbulence created a situation by which the emissions from the OWB would be pushed toward the ground, west of the OWB and, consequently, into Plaintiffs' yard. In light or variable wind conditions (as opposed to a westerly wind), emissions would move in different directions and accumulate generally in the area of the OWB.
On cross-examination, Mr. Leston admitted that he did not research the weather, wind direction, or reports of ground fog on any of the days depicted on video. Further, he admitted that he had taken no measurements, collected no data, performed no air monitoring or meteorological research, and conducted no testing of any kind which would support his opinion that the air quality — or the concentration of particulate matter — was negatively impacted by the operation of Defendants' OWB. He did state on direct examination, however, that his opinion would not have changed because of the close proximity between the structures, the prevailing winds and the location of Defendants' residence upwind from the OWB. In sum, Mr. Leston relied wholly on the wake cavity effect and the westerly winds to support his conclusion that Plaintiffs' property was negatively affected by the operation of Defendants' OWB. *Page 17 
 2 Defendants' Expert
Defendants' expert, Peter Guldberg, was presented and qualified as an expert in air quality monitoring, air dispersion modeling, National Ambient Air Quality Standards, and OWB emissions. He is a certified meteorologist and has 35 years of work experience as an air quality and noise consultant. He has conducted air quality studies of fuel burning sources and has taught air quality permitting and dispersion modeling courses for the EPA and various professional groups.
Mr. Guldberg explained the two methods recommended by the EPA to determine whether air quality is acceptable. The first is monitoring the air at the receiver using an instrument that is certified as the Federal Reference Method for PM2.5. Alternatively, air dispersion modeling using EPA's computer model known as AERMOD, in conjunction with five (5) years of weather data, is an EPA-recommended method for determining PM2.5 particulate matter. For PM2.5, EPA has set a limit of 35 µg/m[3] over a 24-hour period as safe ambient air quality.
Mr. Guldberg performed dispersion modeling in this case using EPA's AERMOD model, which stimulates transport, dispersion and dilution of PM2.5 emissions in the air. According to Mr. Guldberg, based on the dispersion model, the predicted maximum
PM2.5 concentration is 7.8 µg/m[3] and occurs on Defendants' property. At the front of Plaintiffs' home, the maximum PM2.5 concentration is between 4 — 5 µg/m[3], significantly below the 35 µg/m[3] health standard set by EPA. Mr. Guldberg concluded that the emissions from Defendants' OWB were very easily in compliance with the EPA health standard, and that based on that compliance, such emissions were not at a concentration high enough to cause harm. *Page 18 
Although the Model 6048 has a much larger combustion chamber than a woodstove, Mr. Guldberg testified that a larger chamber did not correspond with a negative impact on air quality, and he discounted the significance of the amount of emissions generated from an OWB. The critical question, according to Mr. Guldberg, is concentration of the emissions rather than quantity. Like Mr. Leston, Mr. Guldberg testified that the manner in which the OWB is operated could impact emissions, but he further noted that no formal training beyond reviewing the manual would be necessary to safely operate the Model 6048.
Mr. Guldberg performed a site inspection on two separate occasions — once when the OWB was in operation and once in the summer of 2009. He considered the height of the peaks on Plaintiffs' residence (or the two different rooflines) in relation to the height of the OWB's smokestack, took into consideration the change in grade between the structures, and concluded that the smokestack was at the same height of the higher peak and 8' higher than the lower peak of Plaintiffs' residence. Mr. Guldberg noted that manufacturer guidelines for the Model 6048 recommend the stack on the OWB be 2' above the roof peak of any non-serviced property within 300'.
Mr. Guldberg also reviewed the video footage prepared by Plaintiffs. Unlike Mr. Leston, he did research weather conditions on the days that were depicted on video and testified that a number of those days had reports of ground fog. He testified that the videos depicting Defendants' smokestack most often showed that smoke moved upward out of the smokestack, which is ideal for greater dispersion, and that the smoke from the smokestack was consistent with that from a properly operating OWB. Immediately after refueling, the smoke released will be heavier and thicker than the plume that was frequently observed. *Page 19 
On cross-examination, Mr. Guldberg acknowledged that as recently as the spring of 2009 he served as a consultant to Central Boiler, the manufacturer of the Model 6048. In or about 2006, he provided scientific expertise to assist Central Boiler in responding to a report that had been issued by the Northeast States for Coordinated Air Use Management ("NESCAUM") concerning OWBs. NESCAUM is a quasi-governmental group comprised of state-level environmental officials in New England, New York and New Jersey, and addressed air quality issues. Mr. Guldberg admitted that he disagreed with many of the conclusions about OWB emissions contained in the NESCAUM report, which report was not admitted into evidence at trial.
 H Siting of the OWB
The parties presented a significant amount of testimony concerning the location selected by Louis Pezza to install the OWB. After purchasing the Model 6048 OWB from Mainline Heating Boilers in nearby Connecticut, Mr. Pezza testified that he was given brief guidance on installation and selecting a location for the unit. Mr. Pezza testified that there was no other place on Defendants' property to place the unit: it needed to be near the boiler in the house, which is on the east side of the residence; it would not look right if placed in the front yard of Defendants' property; on the westerly side of Defendants' house was a driveway that would necessarily be driven over; it was not recommended that piping be laid under such heavy traffic area; and it was not recommended that the piping be as long as it would be from a western location to the boiler on the east side of Defendants' house.
Mr. Leston testified that prevailing winds is one factor in the manufacturers' recommendations for where the Model 6048 should be placed. It is not, however, a requirement. Mr. Leston further testified both on direct and cross-examination that there was no other place on *Page 20 
Defendants' property where the OWB could be sited that would not affect Plaintiffs' property because the prevailing westerly winds will always carry emissions from any location on Defendants' property to Plaintiffs' property. In Plaintiffs' Post-Hearing Response Memorandum, Plaintiffs also agree with Defendants that there was no other feasible location on Defendants' property for the placement of the OWB which would not affect Plaintiffs' property. (Pls.' Post-Hearing Resp. Memo. at 2, 6-7.) Defendants' expert, Mr. Guldberg, testified that factors to be considered in siting an OWB include stack height. Given that he had determined that the smokestack on the OWB was at the same height as the higher roofline and 8' higher than the lower roofline on Plaintiffs' residence, he testified that the location of the OWB complied with the manufacturer guidelines for the Model 6048, which recommend the stack be 2' above the roof peak of any non-serviced property within 300'.
 I Regulations Governing Defendants' OWB
Town Solicitor John Bevilacqua testified that the Town of Foster did not have any regulations which applied to the installation or operation of an OWB at the time Defendants' installed and began to operate their unit in the summer of 2008. Louis Pezza testified that although he was not required by the Town or any State agency to do so, he applied for and received electrical, building and plumbing permits for the OWB. Mr. Bevilacqua confirmed that in August, 2008, that Town officials had inspected Defendants' OWB after Louis Pezza sought the electrical, building and plumbing permits.
Mr. Bevilacqua testified that at the time of trial there were approximately fifty (50) OWBs in the Town. Many of these units have been in operation for several years but they have only recently become controversial because of complaints made. The Town now requires *Page 21 
mechanical, electrical and building permits for an OWB that is being secured to a permanent structure, i.e., a slab foundation on which the OWB is placed. Zoning compliance is required for permanent fixtures. An OWB is not treated as an accessory structure. A site plan is also now required by the Town so the Town is aware of the exact location of OWBs, in the same manner that a site plan would be required to do most anything on one's property.
 II STANDARD OF REVIEW
Rule 52(a) of the Superior Court Rules of Civil Procedure provides that "[i]n all actions tried upon the facts without a jury . . . the court shall find the facts specially and state separately its conclusions of law thereon." Super. Ct. R. Civ. P. 52(a). In a non-jury trial, the trial justice sits as the trier of fact as well as of law. Hood v. Hawkins, 478 A.2d 181, 184 (R.I. 1984). "Consequently, he [or she] weighs and considers the evidence, passes upon the credibility of the witnesses, and draws proper inferences."Id. A trial justice's findings of fact will not be disturbed unless such findings are clearly erroneous, the trial justice misconceived or overlooked material evidence, or unless the decision fails to do substantial justice between the parties. Opella v.Opella, 896 A.2d 714, 718 (R.I. 2006) (quoting Bogosian v.Bederman, 823 A.2d 1117, 1120 (R.I. 2003)). While the trial justice's analysis of the evidence and findings need not be exhaustive or "categorically accept or reject each piece of evidence," the trial justice's decision must "reasonably indicate[] that [she] exercised [her] independent judgment in passing on the weight of the testimony and credibility of the witnesses."Notarantonio v. Notarantonio, 941 A.2d 138, 144 (R.I. 2008) (quoting McBurney v. Roszknowski,875 A.2d 428, 436 (R.I. 2005)). Further, although the trial justice is required to make specific findings of fact, "[e]ven brief findings and conclusions are sufficient if they address and resolve the controlling and essential *Page 22 
factual issues in the case." Hilley v. Lawrence,972 A.2d 643, 651 (R.I. 2009) (quoting Donnelly v.Cowsill, 716 A.2d 742, 747 (R.I. 1998)).
Further, in addressing a request for permanent injunction, the trial justice must determine that "the merits of the case call for an order forbidding or compelling particular conduct." 1 Kent Rules of Civil Procedure § 65:1 (2006). "The issuance of an injunction and the scope and quantum of injunctive relief rests in the sound discretion of the trier of fact." DeNucci v.Pezza, 114 R.I. 123, 130, 329 A.2d 807, 811 (1974). If injunctive relief is granted, determining the proper relief requires a balancing of the equities. Id.
 III ANALYSIS A PRIVATE NUISANCE
The law of private nuisance historically has applied to conflicts between neighboring, contemporaneous land uses.Hydro-Manufacturing, Inc. v. Kayser-Roth Corp.,640 A.2d 950, 957 (R.I. 1994) (citations omitted). It is well-settled under Rhode Island law that "[a] private nuisance arises from the unreasonable use of one's property that materially interferes with a neighbor's physical comfort or the neighbor's use of his real estate." Weida v. Ferry,493 A.2d 824, 826 (R.I. 1985); Citizens for Preservation ofWaterman Lake v. Davis, 420 A.2d 53, 59 (R.I. 1980);Iafrate v. Ramsden,96 R.I. 216, 221, 190 A.2d 473, 476 (1963). Rather than impose liability in every case in which one person's conduct has a detrimental effect on a neighbor, Rhode Island courts will impose liability "only in those cases in which the harm or risk to one is greater than he ought to bear under the circumstances."Citizens for Preservation, 420 A.2d at 59 (citing 4 Restatement (Second) Torts, § 822, cmt. g at 112 (1979)). An interference with a neighbor's physical comfort or use of real estate must be unreasonable to rise to the level of a private nuisance. Gimmicks v. Dettore, 612 A.2d 655, 659 (R.I. 1992). Moreover, whether a *Page 23 
particular annoyance is sufficient to be deemed a private nuisance is based upon the effects upon a person of ordinary habits and sensibilities. DeNucci v. Pezza,114 R.I. 123, 129, 329 A.2d 807, 810 (1974).
The burden of proving a nuisance is on the party alleging such nuisance to demonstrate the existence of the nuisance and that an injury was caused by the nuisance. Citizens forPreservation, 420 A.2d at 59. Reasonableness is an issue of fact to be established by the party bearing the burden of proof.Gimmicks, 612 A.2d at 659. Whether the disputed activity is permitted by law may bear on whether the use of the property is reasonable, but judicial relief may still be provided even though the activity complies with local or state regulations.DeNucci, 114 R.I. 123, at 128, 329 A.2d at 809-10. Further, an occasional "once or twice a week" incident will not constitute sufficient impairment of plaintiff's rights to support a finding of a nuisance. Hennessey v. Pine, 694 A.2d 691, 695 (R.I. 1997).
In the instant case, the parties agreed to sever liability on the permanent injunction and trial on the merits from damages. At this juncture, then, Plaintiffs had the burden of demonstrating the existence of the private nuisance without yet having to establish any injury caused by the nuisance. However, in establishing the existence of the private nuisance, Plaintiffs were required to demonstrate the harm or risk of harm caused to Plaintiffs from the operation of Defendants' OWB is greater than they ought to bear under the circumstances. Id. For the following reasons, Plaintiffs have failed to sustain that burden.
 1 Video and Photographic Evidence Plaintiffs assert that the videotape evidence is "the most important evidence in this matter" and they rely heavily on the scenes depicted therein as conclusive proof that emissions from Defendants' OWB constitutes a private nuisance and a continuing trespass. (See Pls.' Post-Hearing Resp. Memo. at 5.) *Page 24 
This Court also finds such evidence to be important inasmuch as the twelve (12) photographs taken on August 2 — 4, 2009 and introduced by Defendants calls into question what is depicted in the video and photographs introduced by Plaintiffs. Specifically, in August 2009, when Defendants' OWB was not in operation and when this trial was underway, Defendants' photographs depict a low-lying density in and around Plaintiffs' property, including in Plaintiffs' front yard, yard to the south of the residence, and through trees in those areas. (Defs.' Ex. I.) This Court concludes that such denseness can only be low-lying fog or smoke from a wood burning unit servicing a house other than Defendants' OWB, including, for instance, Mr. Young's wood burning stove that is directly west of Plaintiffs' barn area. Moreover, this low-lying density, as well as the sun glare in some of Defendants' pictures, is substantially similar to the glare and low-lying haze depicted in videos and Plaintiffs' two photographs. (See, e.g., Defs.' Ex. A, at 10/2/08, 10/9/08, 10/13/08, 10/20/08, 10/26/08, 11/9/08, 11/21/08, 11/29/08, 12/13/08; Defs.' Ex. B, at 1/14/09, 1/17/09, 1/30/09, 2/15/09, 2/19/09, 3/9/09;cf. Defs. Ex. I, Pls.' Exs. 8 and 9.) In any event, it is evident to this Court that Defendants' OWB is not the cause of the hazy, low-lying denseness observed in Defendants' August 2009 photographs, and therefore their OWB may not be the cause of similar hazy, low-lying denseness observed in Plaintiffs' photographs and/or some video depictions of Plaintiffs' property.
Although some smoke directly from Defendants' smokestack is unquestionably depicted in some video footage, in many instances the smoke travels upwards and dissipates in the air with no discernable — or in some instances no attempt to document — effect on Plaintiffs' property. (See,e.g., Defs.' Ex. A, at 9/23/08, 9/24/08, 9/25/08, 9/28/08, 10/7/08, 10/11/08, 11/2/08, 12/21/08; Defs.' Ex. B, at 1/21/09, 1/30/09, 3/9/09.) In the majority of the days for *Page 25 
which video footage was supplied by Plaintiffs, the quality of the video severely compromises what is depicted, due to what appears to be sun glare, darkness, or overcast conditions that make it virtually impossible to observe emissions from Defendants' OWB. While some video footage may accurately display a haze or denseness on Plaintiffs' property caused by the operation of Defendants' OWB (see, e.g., Defs.' Ex. A, at 10/8/08, 11/9/08, 12/23/08, 12/24/08), this Court does not find that four days of smoky conditions from a neighboring OWB over a 5½ month period is unreasonable or that Defendants created a harm or risk greater than Plaintiffs ought to bear under the circumstances. See Hennessey, 691 A.2d at 695 ("once or twice a week" does not constitute sufficient impairment of plaintiff's rights). Additionally, this Court does not find that each other instance of haze or denseness captured on video is caused exclusively or even partially by Defendants' OWB. Based on the contrary evidence depicted in Defendants' Ex. I, the number of wood burning units used on and around Burgess Street, and the rural nature of Foster, this Court finds that Plaintiffs have not sustained their burden of proof in demonstrating that Defendants' OWB was the cause of any harm or risk greater than Plaintiffs ought to bear under the circumstances.
 2 Competing Expert Testimony
Moreover, Plaintiffs' reliance on their expert fell short of satisfying their burden of proving that the emissions from Defendants' OWB were unreasonable or created a harm or risk that was greater than they ought to bear. Plaintiffs engaged an air quality expert whom they elected would not conduct any air monitoring or air quality tests due to the high cost. While Mr. Leston was qualified and informative, the value of his testimony was minimized by the limited task Plaintiffs had assigned to him. *Page 26 
By contrast, Defendants presented reliable and thorough expert testimony that the emissions from Defendants' OWB were well within the air quality standards set by EPA. Specifically, Mr. Guldberg performed dispersion modeling, an EPA-accepted method for determining compliance with federal air quality standards, which revealed that the concentration of emissions from Defendants' OWB at the front of Plaintiffs' residence at between 4 — 5 µg/m[3], well within the EPA health standard of 35 µg/m[3]. Further, this Court is unmoved by Plaintiffs' attempt to discredit Mr. Guldberg's testimony by demonstrating his consultant arrangement with Central Boiler, the manufacturer of the OWB at issue, and his disagreement with the NESCAUM report.
While the expert testimony presented by the parties was lengthy, the credible testimony supported by scientific principles and standards can be summarized as follows: the quality of emissions from an OWB is measured by the concentration of emissions and not the quantity of emissions. An EPA-approved method of calculating the concentration of emissions from Defendants' OWB was utilized by Defendants' expert; Plaintiffs' expert simply failed to perform any other testing or recognized manner of calculating the concentration of emissions and relied instead on the physics theory known as the wake cavity effect. This Court finds Defendants' expert testimony to be more credible than Plaintiffs' expert testimony, which this Court finds to be sorely lacking based upon Plaintiffs' apparent decision to avoid further litigation costs. In short, the weight of the credible evidence before this Court demonstrated that the emissions created by Defendants' OWB were not unreasonable and indeed were well within EPA air quality measurements on Defendants' property as well as on Plaintiffs' property. *Page 27 
 3 Witness Credibility
Plaintiffs' testimony before this Court, on both direct and cross-examination, revealed an obvious bias against OWBs and, consequently, contempt toward Defendants[5] and any official that did not agree with Plaintiffs' position. Mr. Charette had a public campaign against OWBs — reaching out to the General Assembly to fight his campaign against this "terrorism" and to local radio listeners. Mrs. Charette's testimony concerning her journal entries displayed outright distrust and contempt for town officials. Perhaps in an effort to convey their displeasure of OWBs, Plaintiffs' testimony appeared to this Court to exaggerate and overstate facts. For instance, Mrs. Charette's testimony that she needed to hurriedly shut doors to the house and cars, fearing the return of smoke at any moment, the effect on the dog that was restricted from being outside in any event, the changed personalities of her boys from six months of winter-time wood smoke, and the disturbing nature of airplanes in Foster collectively lack credibility. Additionally, the emotional testimony she gave concerning what would happen if a child opened Defendants' OWB and introduced oxygen to the chamber was wholly lacking in support. For Mr. Charette's part, his demeanor both on the witness stand and throughout the trial leaves this Court unimpressed and unpersuaded by his testimony.
Even if Plaintiffs' testimony was not exaggerated or biased, such testimony, at a minimum, evidences that Plaintiffs are not
persons of ordinary habits or sensibilities. To move to Foster and be disturbed by airplane noise or wood smoke is not within a normal range of sensibilities. Simply put, Plaintiffs' own testimony leads this Court to find that Plaintiffs cannot *Page 28 
sustain their burden of proving that the alleged private nuisance exists based on the effects upon a person of ordinary habits and sensibilities. DeNucci, 114 R.I. at 129, 329 A.2d at 810.
By contrast to Plaintiffs' testimony, Louis Pezza and Sarah Pezza testified without motive or bias, but rather to present their reasons why their OWB is needed, how it operates, and the emissions they observe from their OWB. Similarly, Defendants' witnesses, including neighbors and another nearby OWB operator, generally appeared credible and unbiased. On balance, the weight of the credible evidence lies with Defendants and not Plaintiffs.
 B CONTINUING TRESPASS
The Rhode Island Supreme Court has recognized that "[t]o be liable for trespass to property, one must enter the land in the possession of another or cause something to do so, remain on the land, or fail to remove from the land a thing that he is under a duty to remove. A `continuing trespass' is defined as `[a]n unprivileged remaining on land in another's possession.'" Mesolella v. City ofProvidence, 508 A.2d 661, 668 n. 8 (R.I. 1996) (quoting Restatement (Second) Torts § 158 at 277 (1965)). "A continuing trespass wrongfully interferes with the legal rights of the owner."Santilli v. Morelli,102 R.I. 333, 338, 230 A.2d 860, 863 (1967).
Based upon the foregoing analysis of private nuisance and the credibility determinations made therein, this Court finds that Plaintiffs are not entitled to relief based upon a continuing trespass. Plaintiffs did not sustain their burden of demonstrating that the haze and denseness depicted in video and in Plaintiffs' pictures were solely or even partially caused by the emissions from Defendants' OWB, or that any emissions were continuously flowing from Defendants' OWB and not from other wood burning units. Accordingly, this Court cannot find that Defendants would be under a duty to remove emissions from Plaintiffs' property. Finally, in the *Page 29 
absence of such credible proof that the haze and low-lying denseness in the video and pictoral evidence was from Defendants' OWB, this Court cannot find that Defendants wrongfully interfered with the legal rights of Plaintiffs.
 C NEGLIGENCE
It is well-settled that a claim of negligence requires plaintiff to establish a legally cognizable duty owed by the defendant to the plaintiff, a breach of that duty, proximate causation between the conduct and the resulting injury, and actual damages.Santana v. Rainbow Cleaners, Inc.,969 A.2d 653, 658 (R.I. 2009); Willis v. Omar,954 A.2d 126, 129 (R.I. 2008). Whether a duty exists is a legal determination which requires this Court to "consider all relevant factors, including the relationship of the parties, the scope and burden of obligations to be imposed upon the defendant, public policy considerations and notions of fairness." Volpe v.Gallagher, 821 A.2d 699, 705 (R.I. 2003) (quotingHennessey v. Pyne, 694 A.2d 691, 697 (R.I. 1997)). To establish proximate cause, plaintiff must prove that but for the negligence of the alleged tortfeasor, injury to the plaintiff would not have occurred. Geloso v. Kenney,812 A.2d 814, 818 (R.I. 2002). Whether proximate cause exists is a question of fact. Id.
Liability for nuisance is distinguishable from negligence liability. The former, as discussed supra, is predicated upon unreasonable injury, and the latter is predicated upon unreasonable conduct. Weida, 493 A.2d 824, 826 (citing Braun v.Iannotti, 54 R.I. 469, 175 A. 656 (1934)).
With respect to neighboring land owners or users, the Rhode Island Supreme Court has analyzed the existence of a legal duty and found that "as a general proposition, each possessor of land owes to those outside the premises a duty to use reasonable care to prevent them from being *Page 30 
injured as a result of activities on their property."Volpe, 821 A.2d at 705 (citing W. Page Keeton et al.,Prosser and Keeton on the Law ofTorts, § 57 at 387 (5th ed. 1984)). While this Court finds that Defendants owed Plaintiffs a legal duty, the weight of evidence before this Court demonstrates that Defendants did not breach that duty. Rather, the credible and compelling evidence of record reveals that Defendants were reasonable in their placement and operation of their OWB to prevent Plaintiffs and other nearby land owners from being injured by their use of their OWB. Defendants considered and understandably rejected locating the OWB elsewhere on their property. Further, upon Louis Pezza's observation that unseasoned pine created significant emissions and a pungent odor, he no longer used such type of wood. Accordingly, these actions demonstrate that Defendants used reasonable care to prevent injury to their neighbors, including Plaintiffs. See Volpe,821 A.2d at 705.
As this Court finds that there was no breach of duty, proximate cause or damages to Plaintiffs need not be addressed.
 IV CONCLUSION
Based on the testimony, evidence and memoranda submitted and for the reasons stated above, this Court finds that Plaintiffs have failed to sustain their burden of proof in establishing a private nuisance or their entitlement to a permanent injunction. This Court further finds that Plaintiffs' claims for continuing trespass and negligence also fail, and that Plaintiffs are not entitled to any relief. The Consent Order entered into by the parties in March, 2009, is hereby vacated, and Defendants may commence use of their OWB.
Counsel for the prevailing party shall submit an appropriate judgment for entry in accordance with this decision.
[1] After Plaintiffs' Complaint was filed, the parties entered into a Consent Order by which Defendants agreed to cease using the OWB until further order of the Court. Accordingly, there was neither a temporary nor preliminary injunction hearing that took place. The requested injunctive relief was instead set for this non-jury trial on the merits. See generally Super. Ct. R. Civ. P. 65(a)(2) (advancing trial on merits with preliminary injunction hearing).
[2] Expert testimony was conflicting on the exact distance between Defendants' OWB and the front of Plaintiffs' home. Whether that distance is 166' as testified by Plaintiffs' expert or 194' as testified by Defendants' expert has no bearing on the ultimate findings by this Court.
[3] The audio portion may very well still appear on the marked Court exhibits. However, such audio is not evidence nor has it been considered in any way in this Court's decision.
[4] PM2.5 is the measure of fine particulate matter — or solid substances — in the air per Environmental Protection Agency (EPA) standards.
[5] Whether Plaintiffs' attitude toward Defendants is caused by Defendants' use of their OWB or Plaintiffs' mistaken belief that Defendants were the root of their dog being declared vicious and restricted accordingly, as Defendants attempted to bring out through the testimony of multiple witnesses, is not pertinent to this Court's ultimate findings. What is clear, nonetheless, is that Plaintiffs simply are not happy with Defendants.